

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

C.S., )
)
Appellant, )
)
v. )   **WD78800**
)
)   **OPINION FILED:**
)   **March 22, 2016**
MISSOURI DEPARTMENT OF SOCIAL )
SERVICES, CHILDREN'S DIVISION, )
)
Respondent. )

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Jack R. Grate, Judge**

**Before Division Two:** Cynthia L. Martin, Presiding Judge, and
Mark D. Pfeiffer and Karen King Mitchell

C.S. appeals the trial court's judgment upholding the Department of Social Services,

Children's Division's (Division) determination that C.S. should be placed on the Central

Registry.[1]  Because there is sufficient evidence for the trial court to have determined that C.S.

sexually abused his adopted son, K.S.W., we affirm the trial court's judgment.[2]

---

[1] The "[R]egistry is a non-public list of persons [the] Division has determined to have committed child abuse or neglect." *Hessel v. Mo. Dep't of Soc. Servs., Children's Div.*, 400 S.W.3d 813, 815 n.2 (Mo. App. E.D. 2013); § 210.110(3).  "Access to the central registry is available to, in part, employers screening job applicants for positions involving contact with children." *Hessel*, 400 S.W.3d at 815 n.2; § 210.150.2(8).

[2] This is C.S.'s fourth appearance before this court on matters arising out of the same allegations of sexual abuse of K.S.W.  Two appearances involve appeals from judicial review of the Division's determination that C.S.

## Background[3]

In late 2003, when K.S.W. was ten years old, he came to live in C.S.'s home as a foster child with C.S. and his partner, D.W.  C.S. and D.W. later adopted K.S.W. and his older brother in 2006.  K.S.W.'s younger brother came to the home in January 2009.

Shortly after K.S.W. came to live in C.S.'s home in 2003, C.S. and D.W. learned that K.S.W. had a history of being abused by his biological parents, foster parents, and other foster children.  K.S.W.'s biological father physically abused him, and his biological mother sexually abused him.  C.S. and D.W. also learned that K.S.W. had been diagnosed with Reactive Attachment Disorder and Post Traumatic Stress Disorder.  C.S. and D.W. placed K.S.W. in therapy with Dr. Sally Popper, who became the family's therapist.

During the time that K.S.W. lived with them, C.S. and D.W. would "cuddle" in bed with K.S.W. while nude.  C.S. and D.W. stated that, during these cuddling sessions, there were always covers between them and a clothed K.S.W.  In 2008, K.S.W. disclosed to Dr. Popper that he had felt C.S.'s erect penis rubbing against him during one or more of these sessions.  C.S. discontinued cuddling with K.S.W. for a time, after Dr. Popper raised the issue with him, but resumed "cuddling" with K.S.W. when K.S.W. began "regressing and not doing well," and

---

should be placed on the Central Registry for sexual abuse of his son (Central Registry case).  The other appearances involve appeals from the Juvenile Officer's attempt to adjudicate K.S.W. in need of care and treatment because of sexual abuse (care-and-treatment case).  Previously, in this Central Registry case, the Division appealed from a June 1, 2012 judgment holding that the Division was divested of jurisdiction over the matter for failing to complete the investigation within statutory deadlines.  On the parties' joint motion, this court vacated that judgment, dismissed the appeal, and remanded this case to the trial court to adjudicate whether C.S. committed sexual abuse.  This appeal arises from proceedings conducted following that remand.  In the first appeal of the care-and-treatment case, this court reversed a judgment that K.S.W. was in need of care and treatment and remanded the case for a new hearing.  *In re K.S.W.*, 412 S.W.3d 452, 457 (Mo. App. W.D. 2013).  Subsequently, this court dismissed a second appeal in the care-and-treatment case, because the adjudication that K.S.W. was in need of care was not final in that there was no dispositional hearing or judgment.  *In re K.S.W.*, 454 S.W.3d 422, 428 (Mo. App. W.D. 2015).  Less than a month after the juvenile court conducted its second adjudication hearing and six days after it entered its second adjudication order, the court lost jurisdiction over K.S.W. because he turned 21 years of age.  *Id.* at 424 n.3, 425, 428 n.9.

[3] The evidence is "reviewed in the light most favorable to the circuit court's judgment."  *Blanchette v. Blanchette*, 476 S.W.3d 273, 277 n.1 (Mo. banc 2015).

2

having behavioral issues. C.S. indicated that, when he reinstituted "cuddle time," he introduced new "precautions," such as keeping a cover between himself and K.S.W.

In the summer of 2009, when K.S.W. was sixteen years old, C.S. and D.W. found K.S.W. making a bomb in his room out of gunpowder from firecrackers. K.S.W. had allegedly burned down a foster home before, so C.S. and D.W. sent K.S.W. to the Ozanam Treatment Center. K.S.W. would not return to C.S.'s home, because in December 2009, C.S. and D.W. sent K.S.W. to the Woodward Academy in Iowa for sex offender treatment.

Also in the summer of 2009, C.S. and K.S.W. went on a four- or five-day-long Katy Trail bike trip, when K.S.W. was on a pass from Ozanam. C.S. acknowledged that, during the trip, they stayed at bed and breakfasts, and they brought only the clothes they wore during the day, washed and dried their clothes at night, and put them on the next day. Because they brought no clothing to sleep in, they slept unclothed in the same bed, but they were separated by covers. One night during the trip, K.S.W. asked to cuddle, and they lay in bed with C.S.'s arms around K.S.W. C.S. stated that K.S.W. "might have felt something then. I don't know . . . ."

While at Woodward, on September 22, 2010, when he was seventeen years old, K.S.W. disclosed that C.S. had sexually abused him. The Division received a report of K.S.W.'s allegations, and Rhonda Schilli, a Division employee, investigated the allegations of abuse, including interviewing C.S. on multiple occasions. Because there were other foster children living in the home, part of the Division's safety plan required C.S. to move out of the home and into what D.W. referred to as "a really nice RV" during the pendency of the investigation. The record is not entirely clear on when the safety plan ended, but C.S. appears to have moved back into the home in late December of 2010. C.S. claims that he was out of the home for ninety-one days.

3

At the Division's request, K.S.W. was interviewed at Woodward Academy.[4]  In his interview at the Woodward Academy, K.S.W. stated that when he cuddled with C.S. at their home, C.S. would have an erection approximately "every other time."  K.S.W. would feel C.S.'s erection rub against him, and K.S.W. would become uncomfortable and scoot away or change his position.  K.S.W. stated that, on one occasion while cuddling when he was twelve or thirteen years old, K.S.W. woke up to find C.S. masturbating next to him while C.S. had his arm around K.S.W.

Also in his interview at the Woodward Academy, K.S.W. stated that, when he was eleven years old, C.S. showed him a website about masturbation, and C.S. talked about his own masturbation experiences.  K.S.W. then asked C.S. if it was "humanly possible" to "give himself oral," and C.S. talked to K.S.W. about that, too.  On one occasion, K.S.W. claimed that he went to his room and attempted to "self-suck."  He stated that he was using a wall to bend his legs over, when C.S. came in and pushed K.S.W.'s legs down in an effort to help K.S.W. reach his penis with his mouth.  At this point, K.S.W. claimed, C.S. said he had to "take care of business," which K.S.W. understood to mean that C.S. meant he was going to masturbate.  K.S.W. indicated that he then walked into C.S.'s room and saw C.S. masturbating.

Finally, K.S.W. discussed the biking trip when he was sixteen years old.  K.S.W. confirmed that the only clothes C.S. and he took were the biking clothes on their backs.  When they went to bed at night at the bed and breakfasts where they stayed, they were naked, and K.S.W. claimed to have awoken at one point to find C.S. masturbating next to him in bed.

---

[4] C.S. was also interviewed during the investigation.

On January 27, 2011, following its investigation, the Division issued a notice to C.S., indicating that the Division had determined that C.S. had sexually abused K.S.W.[5] The notice indicated that K.S.W. had "described two incidents in which [C.S.] pressed his erect penis against [K.S.W.'s] body," and "described one incident in which [C.S.] masturbated in [K.S.W.'s] presence while the two slept naked in the same bed." The notice also stated that C.S. admitted cuddling with K.S.W. while C.S. was naked and "that, on some occasions, [C.S.] had erections while cuddle time was occurring."

C.S. appealed the determination to the Child Abuse and Neglect Review Board (CANRB), which upheld the Division's determination. C.S. then filed for review in the Circuit Court of Jackson County.

At trial, Dr. Popper testified that K.S.W. could be defiant, antisocial, angry (especially at his adoptive parents), and that he considers himself dangerous. K.S.W.'s ability to bond and attach to others is limited, and he has been diagnosed with Reactive Attachment Disorder, Attention Deficit Hyperactivity Disorder, and a conduct disorder. Dr. Popper testified that it was appropriate for C.S. to cuddle K.S.W. because of his Reactive Attachment Disorder diagnosis, but she did not believe that C.S. had ever sexually abused K.S.W.

C.S. testified that he had never knowingly had an erection while cuddling with K.S.W., but that "yeah, you know, it's possible, it's physiology[,] erections happen," and that he told both Schilli, in her September 24 interview of him, and Dr. Popper that "it's possible, it's physiology, erections happen." C.S. testified that, if he were unclothed while cuddling with K.S.W. in bed, he was always separated from K.S.W. C.S. denied ever masturbating in K.S.W.'s presence.

---

[5] As a result of this finding of abuse, C.S. was eligible to be placed on the Central Registry maintained by the Division.

C.S. testified that he did provide materials on masturbation to K.S.W., but claimed that the Division had screened the materials in advance. C.S. testified that, when he found K.S.W., clothed, with his legs bent over his head, he asked K.S.W. what he was doing, and K.S.W. said that he was "trying to see if I can reach my penis or something like that." C.S. testified that he told K.S.W. to "put his back up against the wall and to put your legs down further and see if that works." C.S. made similar admissions when interviewed by Dr. Popper and Schilli during the Division's investigation, and transcripts of those interviews were admitted into evidence at the *de novo* hearing. C.S. testified that he did not push K.S.W.'s legs down during this incident, or mention anything about masturbation, and that he immediately went downstairs to tell D.W. about what he had witnessed.

C.S. testified that he took K.S.W. on a bike trip, and that, on such trips, there is no room to bring extra clothes other than what the individual is wearing while riding. Therefore, C.S. and K.S.W. washed their clothes when they got to the room and allowed them to dry out overnight. They would individually shower and then remain in the room unclothed. C.S. and K.S.W. slept unclothed in the same bed, separated by covers. C.S. testified that, on one occasion during the trip, he and K.S.W. cuddled in bed unclothed but separated by covers, and that he did not touch K.S.W. with his penis.

K.S.W. did not testify at trial. But the trial court admitted, over C.S.'s objection, the video and transcript of K.S.W.'s interview at Woodward.

Following trial, the trial court reversed the Division's determination and ordered that C.S. be removed from the Central Registry because the Division had not completed its investigation and provided notice within certain statutory deadlines. Following an initial appeal, this court vacated the judgment at the request of the parties and remanded the matter to the trial court. On

6

remand, the trial court found that C.S. had sexually abused K.S.W., determining that C.S.'s "misuse of physical affection, sleeping arrangements, therapy and providing sex education go beyond 'bad parenting.'" C.S. timely appealed.

## Standard of Review

In appeals from placement on the Central Registry, the circuit court conducts a "de novo judicial review" of the Division's determination. § 210.152.6.[6] A "'trial *de novo*, although in theory an appeal of the administrative hearing, is an original proceeding and is not an exercise of review jurisdiction.'" *Petet v. Dep't of Soc. Servs., Div. of Family Servs.*, 32 S.W.3d 818, 821 (Mo. App. W.D. 2000) (quoting *Jenkins v. Dir. of Revenue*, 858 S.W.2d 257, 260 (Mo. App. W.D. 1993)). Accordingly, appellate review of the trial court's judgment is that of an appeal from a judge-tried case. "The circuit court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Blanchette v. Blanchette*, 476 S.W.3d 273, 277 (Mo. banc 2015). "Conflicting evidence will be reviewed in the light most favorable to the circuit court's judgment." *Id.* at 277 n.1. We "defer[] to the circuit court's credibility assessments," and "[w]hen the evidence supports two reasonable but different inferences, this [c]ourt is obligated to defer to the circuit court's assessment of the evidence." *Id.*

Here, the parties requested from the trial court "a brief opinion containing a statement of the grounds for its decision" under Rule 73.01(c).[7] The trial court issued a written judgment that stated the reasons for its decision, but did not include detailed findings of fact and conclusions of

---

[6] Unless otherwise noted, statutory citations are to the Revised Statutes of Missouri as currently supplemented.

[7] All rule references are to Missouri Supreme Court Rules (2015), unless otherwise indicated.

law. In such instances, "[a]ll fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached."[8] Rule 73.01(c).

## Analysis

In his first point on appeal, C.S. argues that the trial court abused its discretion in admitting the out-of-court, unsworn statement of K.S.W. (through the video and transcript of K.S.W.'s interview at Woodward) because it did not fall within any exception to the hearsay rule, it did not have independent indicia of reliability, and it contained accusations of sexual misconduct by C.S. that were not set out in the Division's notice of substantiated findings of abuse. C.S. claims that he was prejudiced as a result of the improper admission of the statement. In his second point on appeal, C.S. argues that the trial court erred in finding that he abused K.S.W. by sexual maltreatment because the court improperly considered allegations of abuse not set out in the Division's Notice of Substantiated Findings; the judgment was not supported by substantial evidence, was against the weight of the evidence, and erroneously declared the law.[9] We will address the claimed error in these two points together.

_____

[8] At various points, C.S. challenges the sufficiency of the trial court's findings and argues that, wherever the judgment does not include an explicit finding on any given issue, we should assume that the trial court did not make such finding or found in favor of C.S. This is incorrect for a number of reasons, not the least of which is that C.S. "waived any such argument by failing to file a post-trial motion to amend the judgment." *Sneil, LLC v. Tybe Learning Ctr., Inc.*, 370 S.W.3d 562, 574 (Mo. banc 2012). "Rule 78.07(c) states that '[i]n all cases, allegations of error relating to the form or language of the judgment, including the failure to make statutorily required findings, must be raised in a motion to amend the judgment in order to be preserved for appellate review.'" *Id.* (quoting Rule 78.07(c)). No such motion was filed in this case. Moreover, even the "failure of a trial court to make such findings mandates reversal only when the trial court's failure to issue requested findings materially interferes with appellate review." *Jamestowne Homeowners Ass'n Trustees v. Jackson*, 417 S.W.3d 348, 359 (Mo. App. E.D. 2013). "'If the record supports the judgment or if the court makes findings that substantially comply with a party's requests, the appellate court will affirm.'" *Id.* (quoting *Valentine v. Valentine*, 400 S.W.3d 14, 19 (Mo. App. E.D. 2013)). The trial court issued a six-page judgment that includes findings and conclusions. C.S. does not assert that the lack of any specific finding materially interferes with our review. And again, "All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." *Id.* (quoting Rule 73.01(c)).

[9] We must mention a number of deficiencies in C.S.'s briefing that have hindered our review. First, the statement of facts fails to comply with Rule 84.04(c), which requires "a fair and concise statement of the facts relevant to the questions presented for determination without argument." "'The primary purpose of the statement of facts is to afford an immediate, accurate, complete and unbiased understanding of the facts of the case.'" *Jackson v. Raney*, 476 S.W.3d 333, 335 (Mo. App. W.D. 2015) (quoting *Tavacoli v. Div. of Emp't Sec.*, 261 S.W.3d 708, 710

## I. Admissibility of K.S.W.'s out-of-court statement

A *de novo* review in this context is like other hearings held in the circuit court. *Jamison v. Dep't of Soc. Servs., Div. of Family Servs.*, 218 S.W.3d 399, 417 (Mo. banc 2007). Thus, "if a victim . . . does not testify, any prior statements or affidavits would be inadmissible unless a recognized hearsay exception applied." *Id.* Missouri courts have recognized "a special hearsay exception," in cases "[w]here the best interest of the child is the primary concern . . .[,] where abuse may have occurred, or has been threatened, and the child might not be competent or reasonably expected to testify to it." *In re Marriage of P.K.A.*, 725 S.W.2d 78, 81 (Mo. App. S.D. 1987). The rationale for the creation of the special exception was that, while "it may be an unfavorable reflection on the [parent] if he[ or she] has not been abusing the child, the paramount consideration must be the welfare of the child." *Id.* While the exception was initially applicable in only care and custody proceedings, it has since been expanded to cases in which the issue was whether an individual would be placed on the Central Registry. *Pope v. Child Abuse & Neglect Review Bd.*, 309 S.W.3d 362, 366 (Mo. App. E.D. 2010) ("listing perpetrators of abuse in the

---

(Mo. App. W.D. 2008)). C.S.'s statement of facts does not contain a fair and concise statement of the facts relevant to the questions presented. It instead consists of six numbered paragraphs, three of which simply state the dates upon which certain procedural events took place. The remaining three paragraphs are argumentative challenges to three findings of the trial court, with little in the way of context. C.S.'s statement of facts leaves the reader at a complete loss as to the events leading up to this appeal. A deficient statement of facts fails to preserve an appellant's claims for appellate review. *Id.*

Additionally, Point II is "multifarious in that it collapses disparate contentions of error into a single point relied on contrary to Rule 84.04(d)." *Atkins v. McPhetridge*, 213 S.W.3d 116, 120 (Mo. App. S.D. 2006). The point contains four sub-points, separated by "and/or," which appear to attempt to collectively set forth claims that the judgment is against the weight of the evidence, erroneously applies the law, and is unsupported by substantial evidence. "Structuring a point relied on so that it groups together contentions not related to a single issue violates Rule 84.04." *Martin v. Reed*, 147 S.W.3d 860, 863 (Mo. App. S.D. 2004). Moreover, "[a] substantial-evidence challenge, a misapplication-of-law challenge, and an against-the-weight-of-the-evidence challenge . . . are distinct claims[, and] must appear in separate points relied on in the appellant's brief to be preserved for appellate review." *Ivie v. Smith*, 439 S.W.3d 189, 199 n.11 (Mo. banc 2014). "Improper points relied on, including those that are multifarious, preserve nothing for appellate review." *Martin*, 147 S.W.3d at 863.

Despite these deficiencies, our preference is to resolve cases on the merits. To the extent we are "able to understand the nature of the claim[s] presented, and" the Division was "able to understand and effectively address those claim[s] in its responsive brief, we exercise our discretion to review [C.S.'s] claims *ex gratia.*" *Powell v. City of Kansas City*, 472 S.W.3d 219, 225 n.9 (Mo. App. W.D. 2015).

Registry provide[s] a means to protect both victims of child abuse and other children with whom a perpetrator of abuse or neglect might come into contact").

"This exception applies to non-jury sexual abuse cases where (1) the best interest of the child is the primary concern; (2) sexual abuse may have occurred, or has been threatened; (3) the child might not be competent or reasonably expected to testify to it; and (4) there is a substantial basis that the statements are true." *In Interest of S.M.*, 750 S.W.2d 650, 654 (Mo. App. E.D. 1988). "Flexibility is needed in these cases, even where the child might be qualified to testify, because of the emotional trauma that such an experience may cause." *P.K.A.*, 725 S.W.2d at 81. "It is desirable to avoid the necessity of forcing a young child to testify as to abuse, particularly when the abuser is the victim's parent." *Id.*

But K.S.W. was not a child at the time of the hearing. It is true, as the Division argues, that K.S.W. was only seventeen years old at the time of his statement and that a "child" for purposes of child protection laws is "any person . . . under eighteen years of age." § 210.110(4). But the hearsay exception is meant to protect children from *testifying*. *P.K.A.*, 725 S.W.2d at 81. ("It is desirable to avoid the necessity of forcing a young child to *testify* as to abuse, particularly when the abuser is the victim's parent." (emphasis added)). K.S.W. was nineteen years old at the time of trial, with no evidence that there was any chance that he would ever live with his adoptive parents again. Having K.S.W. testify at trial would not have invoked the same concerns regarding the "emotional trauma" inherent in "forcing a young child to testify as to abuse." *P.K.A.*, 725 S.W.2d at 81. The Division offered no evidence concerning the likelihood of emotional trauma or evidence drawing into question K.S.W.'s competence to testify. Rather, at oral argument, counsel for the Division indicated that the "parental relationship," as well as K.S.W.'s relatively young age at the time of trial—although he was no longer a minor—justifies

10

the expansion of the special hearsay exception to this case. But, the Division offers no basis for differentiating the present case from others in which older adults may seek to avoid testifying about childhood abuse by having a taped statement played at trial. No easily applied standard separates adults who would be forced to testify from those who would not testify. We believe that the Division's proposed expansion of the hearsay exception beyond the protection of vulnerable children, would be unworkable and would not strike the appropriate balance between the desire to protect child victims of abuse and the need to protect the rights of the accused.[10] Accordingly, the trial court erred in admitting K.S.W.'s statement.

But the fact that the trial court erroneously admitted the statement does not mandate reversal. "'For evidentiary error to cause reversal, prejudice must be demonstrated.'" *S.F.M.D. v. F.D.*, 477 S.W.3d 626, 636 (Mo. App. W.D. 2015) (quoting *State v. Reed*, 282 S.W.3d 835, 837 (Mo. banc 2009)). "'Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial.'" *Id.* (quoting *State v. Forrest*, 183 S.W.3d 218, 224 (Mo. banc 2006)). Accordingly, "the erroneous admission of evidence in a court-tried case is not grounds for reversal as long as there is substantial admissible evidence in the record to support the judgment." *D.L.H. v. H.T.H.*, 780 S.W.2d 104, 105 (Mo.

---

[10] The exception may also be inapplicable because the statement was not reliable. "Like all other jurisdictions, Missouri grounds its hearsay exceptions in trustworthiness." *State v. Bell*, 950 S.W.2d 482, 486 (Mo. banc 1997). And the hearsay exception at issue here applies only "[w]here there is a substantial basis to believe that the statements of the child are true." *In re Marriage of P.K.A.*, 725 S.W.2d 78, 81 (Mo. App. S.D. 1987). Here, the trial court appears to have determined that there was not a substantial basis to find the statement true. The trial court noted that, beyond its general "suspicio[ns] of anybody that doesn't get cross-examined," K.S.W.'s statement lacked credibility for additional reasons:

> we've got quite a bit of evidence already here about the propensity of [K.S.W.] to say whatever is convenient, or maybe even all the way of hurtful out of spite compared to any evidence that I have heard, which I think is no[t] a propensity of truthfulness. So I'm suspicious of anything that [K.S.W.] says but I should be mindful of it.

Based on this finding, it is difficult to conclude that the trial court determined "there is a substantial basis to believe that the statements of the child are true." *Id.*

App. E.D. 1989). We therefore turn to whether substantial evidence, absent K.S.W.'s out-of-court statement, supports the trial court's determination that C.S. abused K.S.W. by sexual maltreatment.

**II.    Sufficiency of the evidence to support the trial court's finding that C.S. abused K.S.W.**

**A. The trial court was not limited to considering only those allegations of abuse set out in the Division's Notice of Substantiated Findings.**

C.S. appears to argue that the trial court erred in allowing the Division to present evidence of alleged abuses that were not specifically mentioned in the Division's Notice of Substantiated Findings, because in allowing the admission of such evidence and in relying upon that evidence, the trial court violated both Chapter 210 and due process.[11] We disagree.

**i.    Chapter 210**

The process for challenging placement on the Central Registry based on the Division's determination of abuse or neglect, is set out in Chapter 210. Section 210.152 requires the Division to provide the alleged perpetrator with "notice . . . [t]hat the division has determined . . . by a preponderance of the evidence . . . that abuse or neglect exists." § 210.152.2(1). A party aggrieved by the division's determination may appeal the determination to the CANRB.

---

[11] In its Notice of Substantiated Findings, the Division concluded that its determination of sexual maltreatment was supported by a preponderance of the evidence based on its October 2010 forensic interview of K.S.W. and its December 2010 interview of C.S. The Notice specifically mentions that K.S.W. "provided a detailed description of at least three specific incidents of sexual abuse by [C.S., including] two incidents in which [C.S.] pressed his erect penis against [K.S.W.'s] body [and] one incident in which [C.S.] masturbated in [K.S.W.'s] presence while the two slept naked together in the same bed." The notice also expressly relied on admissions by C.S. that K.S.W. cuddled with C.S. and D.W. while both "lay unclothed in their bed [and] on some occasions, he had an erection while cuddle time was occurring." In its judgment, the trial court ultimately found "that the State has met its burden in proving, by a preponderance of the evidence, that [C.S.] abused KSW by sexual maltreatment, affirming the Notice of the CANRB and the Children's Division." Earlier in the Judgment the trial court summarized the allegations that it believed were included in the Division's Notice, including that C.S. encouraged K.S.W. to engage in "self-sucking" and that C.S. showed K.S.W. websites containing adult sexual content and advice on ways to masturbate. In rejecting C.S.'s claim that his actions were merely "bad parenting" rather than abuse, the trial court noted that C.S.'s "misuse of physical affection, sleeping arrangements, therapy and providing sex education go beyond 'bad parenting.'" Given the language of the Judgment, although it is not completely clear, it appears that, in reaching its Judgment, the trial court relied on allegations that C.S. encouraged self-sucking and provided masturbation advice, which were not expressly set out in the Notice of Substantiated Findings.

12

§ 210.152.4. Following the CANRB's hearing, at which the alleged perpetrator may appear, offer testimony from witnesses, and be represented by counsel (§§ 210.152.5, .153.4(2), (3)), the CANRB "shall sustain the division's determination [only] if such determination . . . is supported by a preponderance of the evidence . . . and is not against the weight of such evidence." § 210.152.5. Finally, § 210.152.6 allows an "alleged perpetrator [who] is aggrieved by the decision of the" CANRB to "seek de novo judicial review in the circuit court of the county in which the alleged perpetrator resides."

These statutes do not limit the Division's evidence in the circuit court to incidences of abuse specifically referenced in the Notice. Rather, the statute referencing notice requires only that an alleged perpetrator receive notice that the Division has made a determination about the ultimate issue, whether "abuse or neglect exists." § 210.152.2(1). And a "'trial *de novo*, although in theory an appeal of the administrative hearing, is an original proceeding and is not an exercise of review jurisdiction.'" *Petet*, 32 S.W.3d at 821 (quoting *Jenkins*, 858 S.W.2d at 260). Thus, "[w]hen the determination of the CANRB is challenged and the alleged perpetrator seeks *de novo* judicial review in the circuit court, that court conducts a fresh hearing on the matter and is not limited in any way by the previous decisions of the Division or the CANRB." *Id*. Rather, the parties are "afforded the opportunity for a full hearing on all issues." *Id*.

Despite the clear language of Chapter 210 and the cases interpreting it, C.S. argues that *In re K.S.W. v. C.P.S.*, 412 S.W.3d 452 (Mo. App. W.D. 2013), mandates that the Division's "allegations of abuse or neglect stand or fall on precisely what has been specifically alleged in the . . . [notice] and nothing else." *In re K.S.W.*, however, is a care-and-treatment case that falls under Chapter 211, and as such, interprets different statutes and rules, and is distinguishable from the present case.

13

Chapter 211 governs the determination of whether the juvenile court has jurisdiction over a care-and-treatment case. "When the juvenile officer files a petition alleging that a child is without proper care and treatment under Chapter 211, the juvenile court conducts a bifurcated hearing." *In re Y.S.W.*, 402 S.W.3d 600, 603 (Mo. App. E.D. 2013). "The juvenile court first conducts an adjudication hearing, wherein the juvenile court must determine whether clear and convincing evidence exists that the child is in need of care because the parents neglected to provide the care necessary for the child's well being." *Id.* "The purpose of the adjudication hearing is for the juvenile court to determine whether there exists sufficient evidence that the court should assume jurisdiction over the child." *K.S.W. v. C.P.S.*, 454 S.W.3d 422, 426 (Mo. App. W.D. 2015). "If, at the adjudication hearing, the court determines that such evidence exists, the court then moves to the dispositional phase." *Id.* "Only if the juvenile court finds that *the allegations of the Juvenile Officer's petition* are proven by clear and convincing evidence may the juvenile court assert jurisdiction over the child" and move to the second stage of the process. *Y.S.W.*, 402 S.W.3d at 603 (internal citations omitted) (emphasis added).

> The scope of the adjudication hearing is carefully defined by Rule 124.06, which, inter alia, states: "Upon finding that *the allegations in the petition* or motion to modify are neither admitted nor proved, the court shall enter judgment denying the petition and, unless it has prior and continuing jurisdiction . . . order that the juvenile be returned to the juvenile's parent . . . ."

*Id.* at 604 (quoting Rule 124.06(d)) (emphasis added). Thus, "the juvenile court is divested of any authority to" act upon any allegation that is *not specifically alleged in the petition*. *Id.*

Because it was a care-and-treatment case, *In re K.S.W.* was initiated by the filing of a petition by the Juvenile Officer, asking the juvenile court to take jurisdiction over K.S.W. based on specific allegations of abuse. In its judgment, the juvenile court "sustained each allegation in the petition and found K.S.[]W. to have been abused and/or neglected by Appellants and subject

14

to the jurisdiction of the court pursuant to [§] 211.031.1." *In re K.S.W.*, 412 S.W.3d at 454. It was from this finding that C.S. appealed. It is not surprising that different rules and procedures apply to care-and-treatment cases, in which the Juvenile Office is the petitioner and is seeking to trigger juvenile court jurisdiction, than those that apply to Central Registry cases where an alleged abuser seeks *de novo* judicial review of an administrative decision and the Division is the respondent. Here, for example, the Division, as respondent, can obviously not be held to stringent pleading requirements such as those required in § 211.031 cases. And as noted, the statutes governing placement on the Central Registry do not contain any similar requirement that the Division be bound by any specific allegations, and instead provide for a *de novo* review, which allows both parties to present additional evidence. Therefore, we find that Chapter 210 does not limit a circuit court's *de novo* review to allegations of specific misconduct set out in the Division's Notice of Substantiated Findings and that *In re K.S.W.* is not controlling.

### ii. Due process

C.S. also appears to argue that admitting and relying on evidence of allegations not included in the Notice of Substantiated Findings was error because it violated his right to due process.[12] Again, C.S. relies on *In re K.S.W.*, which holds that, in the context of

---

[12] C.S. did not raise this issue in his point relied on. An appellant "waive[s] appellate review of [an] issue by failing to raise the merits of this claim in" its point. *State v. Brightman*, 388 S.W.3d 192, 196 n.4 (Mo. App. W.D. 2012); *see* Rule 84.04(d). It is also doubtful that C.S. preserved this argument below:

> "To properly raise a constitutional issue, the party must (1) raise the question at the first available opportunity; (2) specifically designate the constitutional provision alleged to have been violated, such as by explicit reference to the article and section, or by quotation from the particular provision; (3) state the facts showing the violation; and (4) preserve the constitutional question throughout for appellate review."

*In re A.R.*, 330 S.W.3d 858, 864-65 (Mo. App. W.D. 2011) (quoting *Strong v. Am. Cyanamid Co.*, 261 S.W.3d 493, 525 (Mo. App. E.D. 2007)). Neither C.S.'s petition nor the trial transcript contains any specific reference to any constitutional provision. We nevertheless address, *ex gratia*, the argument, as well as C.S.'s remaining due process arguments, contained *infra*.

15

care-and-treatment cases in juvenile court, due process mandates that a parent facing allegations of abuse or neglect receive notice of the specific allegations of misconduct.

> "It is well established that litigants facing deprivations are guaranteed notice of, and the opportunity to defend against, the charges against them. Due process mandates that parents in juvenile court facing allegations of abuse or neglect are entitled to the same notice of the specific allegations of abuse or neglect against them, and the opportunity to defend against those charges."

*Id.* at 457 (quoting *Y.S.W.*, 402 S.W.3d at 604).

It is, of course, a "fundamental principle that due process requires reasonable notice and an opportunity to be heard." *Blanchette*, 476 S.W.3d at 282. "For that inquiry, notice required by due process is fact-specific and will vary with the circumstances and conditions presented." *Id*. Here, C.S. had the opportunity to depose all of the Division's witnesses, as well as to propound interrogatories to the Division, in order to determine what conduct the Division alleged constituted abuse. Indeed, C.S. is unable to point to a single incident upon which the Division provided evidence at trial that had not previously been disclosed in discovery. C.S. was, moreover, allowed the use of subpoenas to obtain any materials or witnesses he wished to present at trial. And, of course, he was allowed to fully participate at the trial. We are aware of no case in which a court has held that due process requires more than the full panoply of discovery and process available to all civil litigants, which C.S. was allowed in this case. As our Supreme Court has held, "due process is satisfied for purposes of the Child Abuse Act and the central registry when an alleged perpetrator is given notice and an opportunity to be heard before his or her name can be listed in that registry." *Frye v. Levy*, 440 S.W.3d 405, 414 (Mo. banc 2014); *see, e.g., Blanchette*, 476 S.W.3d at 282 ("serv[ice] in accord with [court rules] and . . . the opportunity to participate in the hearing telephonically or at the very least to request a continuance" was sufficient for due process purposes in child support and custody modification).

16

C.S.'s only cited authorities, *In re K.S.W.* and *Y.S.W.*, involved specific procedural requirements mandated by statute and Supreme Court Rule, which are not at issue here. And as a matter of due process, C.S. was provided with "notice of the specific allegations of abuse or neglect . . . and the opportunity to defend against those charges," which is all that was required by *In re K.S.W.* and *Y.S.W.* Therefore, to the extent the trial court relied on alleged misconduct not included in the Division's Notice of Substantiated Findings, C.S. was not denied due process.

## B. There was sufficient evidence to support the finding that C.S. abused K.S.W. by sexual maltreatment.

C.S. argues that the trial court's finding that he abused K.S.W. by sexual maltreatment was not supported by substantial evidence and that the trial court misapplied the law in that there was not substantial evidence that he intentionally touched K.S.W. with his erect penis or that he masturbated to orgasm while in bed with K.S.W. and that, absent evidence to support either finding, there was insufficient evidence that met the legal definition of sexual abuse. C.S. argues that, rather than apply the appropriate legal standard, the trial court relied on its own subjective standard of poor parenting to reach its decision.

### i. Allegations supported by substantial evidence

C.S. never disputed that he repeatedly engaged in "cuddle time" with K.S.W. from the time K.S.W. was eleven years old until he was sixteen or seventeen. C.S. was naked during these interactions, which took place in C.S.'s bed. C.S. acknowledged discovering that K.S.W. believed that C.S. periodically experienced erections during this cuddling, and that the cuddling was temporarily stopped when this was discovered. C.S. further acknowledged that cuddling was later resumed, again in C.S.'s bed, with C.S. naked. C.S. also admitted that he took K.S.W. on a biking trip, when K.S.W. was sixteen years old, and that C.S. intentionally brought no extra clothes along for either himself or K.S.W., with the intent being that both of them would sleep

17

naked in the same bed. On one occasion, C.S. and K.S.W. also engaged in cuddling in bed, while both were naked, during this trip.

C.S. testified that he did not knowingly cuddle with K.S.W. while he had an erection, although he acknowledged that it was possible that he had an erection while cuddling. Transcripts of C.S.'s interviews with Division investigator Schilli and Dr. Popper were admitted into evidence at the hearing. During those interviews, C.S. acknowledged the possibility that he had erections during cuddle time, stating to the Division investigator that, "if [he] did have an erection, that [he] kept it far enough away from [K.S.W.] that he wasn't going to feel anything." He further referred to knowingly having erections, telling the Division's investigators that during such situations, "It was a matter of . . . do you make a point of [the erection], by pushing away, or do you just ignore it," and "it's just like, . . . let's not make a point of it. Let's not bring attention to anything."

The trial court was allowed to accept C.S.'s admissions during previous interviews that he had erections and reject his subsequent protestations at trial that he did not. The trial court was also entitled to disbelieve C.S.'s self-serving testimony about the precautions he allegedly took to ensure that K.S.W. would not feel any erections, as well as C.S.'s claimed reasons for booking a single room with a single bed on the trip and not bringing any clothing to wear to bed. Moreover, the trial court must review not only the evidence but also all reasonable inferences therefrom. And "[w]hen the evidence supports two reasonable but different inferences, this [c]ourt is obligated to defer to the circuit court's assessment of the evidence." *Id.* at 278 n.1. One reasonable inference from this record is that C.S. repeatedly enticed his adopted son into his bed, where he or both of them would be naked, he then held K.S.W. closely against his own body while he maintained an erection, and that this was done for C.S.'s own sexual gratification.

Based on this evidence, the trial court was justified in finding that C.S. "misuse[d] . . . physical affection, sleeping arrangements, and therapy."[13]

Further, at trial C.S. testified that he provided materials on masturbation to K.S.W., but that the Division had screened the materials in advance. As to the "self-sucking" incident, C.S. acknowledged that when he found K.S.W., clothed, with his legs bent over his head, C.S. asked what K.S.W. was doing. K.S.W. told him that he was "trying to see if [he] c[ould] reach [his] penis," and C.S. instructed K.S.W. to "put his back up against the wall and to put [his] legs down further and see if that works."

Thus, the evidence and reasonable inferences therefrom supported a finding that: (1) on multiple occasions, C.S. had an erection while cuddling in bed with K.S.W.; (2) C.S. encouraged K.S.W. to engage in "self-suck[ing]" by suggesting easier ways to achieve the act; (3) C.S. showed K.S.W. material containing sexual content and advice on ways to masturbate; and (4) C.S. took K.S.W. on a trip where he intentionally did not bring extra clothes, resulting in the two of them sleeping together naked. The question then is whether these acts are sufficient to constitute abuse by sexual maltreatment.

### ii. The legal definition of abuse

Under § 210.110(1), abuse is defined as "any physical injury, sexual abuse, or emotional abuse inflicted on a child other than by accidental means by those responsible for the child's care, custody, and control."[14] While sexual abuse is not defined in Chapter 210, because the Division identified the type of abuse as "sexual maltreatment," C.S. points us to the definition of sexual maltreatment that was in the Division's Child Welfare Manual, available to all foster

---

[13] Dr. Popper testified that cuddling was a way of addressing K.S.W.'s Reactive Attachment and Post Traumatic Stress Disorder.

[14] This court has noted, in unrelated circumstances, that the definition in "'the statute leaves the final construction of these terms to the experience and judgment of Missouri's trial courts.'" *Reno v. Reno*, 461 S.W.3d 860, 864 (Mo. App. W.D. 2015) (quoting *Soehlke v. Soehlke*, 398 S.W.3d 10, 17 (Mo. banc 2013)).

19

parents, during the time period at issue: "The use[,] persuasion, inducement, enticement, or coercion of any child under the age of 18 to engage in or having a child assist any other person to engage in any sexually explicit conduct by those responsible for the child's care, custody and control."[15] The legislature has also instructed that the system set out in Chapter 210 be implemented to ensure that "'the safety and welfare of children is paramount,'" and that this mandates that the definition of abuse not be artificially restrictive, but rather must be read to encompass all potentially abusive conduct. *Birdsong v. Children's Div., Mo. Dep't of Soc. Servs.*, 461 S.W.3d 454, 462 (Mo. App. W.D. 2015) (quoting § 210.112.1(1)).

As noted *supra*, at a minimum, a reasonable inference from the record is that C.S. enticed his adopted child into his bed, on multiple occasions, for purposes of his own sexual gratification. Further, each of the four incidents substantiated by the evidence in this case is explicitly sexual in nature. They are abusive as to this child, in part, because, as the trial court found, this child's history of sexual abuse made him "fragile" and more susceptible to maltreatment.[16] Ultimately, the record supports a finding that C.S.'s conduct amounts to sexual abuse.

C.S. further argues that the trial court misapplied the law because it based its decision on its "personal and subjective opinions regarding what constitutes appropriate parental decisions labeled by the [c]ourt as 'poor, lousy, stinking bad parenting,'" rather than on the definition of abuse or sexual maltreatment. C.S. bases this allegation on several statements by the trial court,

---

[15] This court has cautioned the Division that it should not make a determination of abuse based solely on this definition because it "is not found in any statute or regulation." *Birdsong v. Children's Div., Mo. Dep't of Soc. Servs.*, 461 S.W.3d 454, 462 n.14 (Mo. App. W.D. 2015).

[16] C.S. argues that the trial court's reliance on K.S.W.'s emotional state transforms the court's finding from that of sexual abuse to one of emotional abuse and that there was insufficient evidence to find emotional abuse because there was no evidence that K.S.W.'s emotional state worsened as a result of C.S.'s conduct toward him. We reject the suggestion that the trial court found emotional abuse. Rather, it is clear from the judgment that the trial court considered K.S.W.'s emotional condition in determining whether C.S.'s conduct amounted to sexual mistreatment of this child. We find reliance of characteristics unique to K.S.W., at least insofar as they were wholly known and understood by C.S., to be appropriate in determining whether abuse of a sexual nature occurred.

20

directed toward Dr. Popper after her testimony had concluded. The trial court generally questioned Dr. Popper about the appropriateness of certain educational materials C.S. had provided to K.S.W., as well as general conduct that had occurred in the home. C.S. specifically relies on the following statements by the trial court as proof that the court decided the case—not on the law, but rather its own subjective beliefs:

> I find it hard to imagine and I raised two boys, two girls and they're all adults now—that I would be pointing my sons to a masturbation website. Actually, it would never cross my mind that any boy needed lessons, or any boy wouldn't discover this themself (sic) because I thought we all did. Hypothetically some kids don't. I just dialed in that website there and it is a picture of a bunch of guys holding their penis in their hand, among other things. What I would like to do to make sure I get the measure of you, is there some way in which you think it is normal for a father to refer his son to a masturbation website?

> . . .

> This whole business—I'm trying to imagine a scenario and I want you to comment on this. When my boys were 16 and 17, I can't imagine me being in a bed with them naked, even if I had ten blankets and 14 comforters.

> . . .

> As it relates to [C.S.] raising this . . . troubled kid. He showed at least on several different respects profoundly lousy, poor, judgment, would you agree? Here is how you suck yourself, I'll give you a lesson. Here's a manual on how to masturbate. Let's all get in the bed naked.

> . . .

> I'm talking about on the bike trip . . . . Would you agree with my initial statement then, there is profoundly poor judgment going on here? . . . Would you agree with me that it's profoundly, lousy, stinking parenting judgment to behave like this? If I found out, for example, one of my four brothers, and all five of us raised kids—If I found one of them was doing these types of things raising their children I would be deeply troubled, you're not?

C.S. argues that these statements represent the "improper insertion of the [c]ourt's personal opinions and subjective views into the case."

We have already determined that the Judgment is supported by substantial evidence. We additionally note, however, that C.S. has misrepresented the record. C.S. makes no mention of the fact that the questioning at issue was prefaced by the trial court's statement to Dr. Popper that "I need to get the measure of you as far as what I am going to make of your testimony. So I'm going to ask you some questions that in my mind bear upon credibility." Dr. Popper had just testified that K.S.W. was a highly vindictive individual, and that she thought his allegation of abuse against C.S. was in retaliation for a perceived injustice. And in order to gauge the credibility of Dr. Popper's testimony, the trial court wanted to know whether Dr. Popper thought that certain conduct—about which she had just testified did not constitute abuse—represented proper parenting methods. Far from imposing the trial court's own subjective beliefs on the ultimate issue presented, the trial court's questioning of Dr. Popper was nothing more than an attempt to determine the amount of weight to give her testimony.

Even without consideration of K.S.W.'s out-of-court statement, there was substantial evidence to support the trial court's judgment affirming the finding of sexual abuse. Thus, C.S. was not prejudiced by the admission of K.S.W.'s out-of-court statement. C.S.'s first and second points are denied.

**III.   Alleged violation of C.S.'s due process rights by the Division's failure to timely complete the investigation**

In his final point, C.S. argues that the Division's failure "to complete its investigation and provide substantiated findings within the time mandated by RSMo § 210.152 . . . depriv[ed C.S.] of constitutionally protected rights . . . without due process of law."

"The Due Process Clause of the Fourteenth Amendment prohibits governments from depriving 'any person of life, liberty, or property, without due process of law.'" *Creason v. City of Washington*, 435 F.3d 820, 824 (8th Cir. 2006) (quoting U.S. Const. amend. XIV, § 1). "This

22

clause has two components:  procedural due process and substantive due process." *Id*.  C.S. was

deprived of neither by virtue of the Division's failure to meet the statutory deadlines.

### A. Procedural due process was not violated.

"'A procedural due process claim focuses not on the merits of a deprivation, but on

whether the State circumscribed the deprivation with constitutionally adequate procedures.'"

*Creason*, 435 F.3d at 824 (quoting *Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998)).  At

the time of the investigation, Missouri law required the Division to "complete all investigations

within thirty days, unless good cause for the failure to complete the investigation is

documented." § 210.145.14 RSMo (2011).[17]  The Division was similarly required to, "[w]ithin

ninety days of receiving a report of abuse or neglect that is investigated," notify the alleged

perpetrator of the outcome of the investigation.[18] § 210.152.2(1-2) (2011).  Because the Division

did not meet these deadlines, C.S. argues that his due process rights were violated.[19]

---

[17] The Division is now required to "complete all investigations within forty-five days, unless good cause for the failure to complete the investigation is specifically documented." § 210.145.15.  The section now also includes a non-exhaustive list of circumstances that qualify as "good cause."

[18] The Division must now provide such notification "[w]ithin ninety days, or within one hundred twenty days in cases involving sexual abuse." § 210.152.15(3).

[19] While not mentioned in his point relied on, C.S. also appears to argue that we should find that the Division did not have good cause to extend the investigation beyond the statutory deadlines.  Even if the argument had been preserved, we are not authorized to review the determination of good cause.

> Section 210.152.4 authorizes the Board to review the "determination of abuse or neglect by the division."  In particular, section 210.152.5 provides that the Board "shall sustain the division's determination if such determination was . . . supported by a preponderance of the evidence . . . and is not against the weight of such evidence."  Nowhere in section 210.152.4 or .5 is the Board authorized to review the Division's good cause determinations, and nothing in section 210.152.6 authorizes courts to review anything but "the decision of the child abuse and neglect review board."  Because this review is *de novo*, this Court has held that section 210.152.6 allows a trial court to evaluate **evidence** that was not presented to the Board.  *Jamison v. Department of Social Services*, 218 S.W.3d 399, 415 (Mo. banc 2007).  But neither *Jamison* nor the language of section 210.152.6 allows the trial court to review *issues*, e.g., good cause, that the Board did not decide and had no statutory authority to decide.

*Williams v. Dep't of Soc. Servs., Children's Div.*, 440 S.W.3d 425, 429 (Mo. banc 2014).

C.S.'s argument is foreclosed by our Supreme Court's declaration that an individual "has no due process right to be free from the Division's investigation of the hotline report . . . and no due process right to have such an investigation start or stop at any particular time." *Frye*, 440 S.W.3d at 415. "'The Due Process Clause is not implicated . . . because an administrative investigation adjudicates no legal rights'"; therefore, there is no prejudice from any such investigation. *Id.* (quoting *S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 742 (1984)). "This lack of prejudice . . . dooms" a due process claim based on the length of an investigation. *Id.*

C.S. points out that *Frye* did not purport to make a blanket holding that "no willful or unjustified violation" of the statutes, "no matter how egregious, can <u>never</u> constitute a denial of due process." Indeed, the Supreme Court did speculate that "it may be conceivable that an investigation could continue so long that such prejudice could occur." *Frye*, 440 S.W.3d at 415. C.S. then points out seven examples of how he was prejudiced by the Division's delay. In his first six examples, C.S. refers to various portions of the Division's investigation in which he believes that the Division made errors or took too long to perform tasks. We need not set forth with specificity each alleged example because, besides referring to each example as "willful" or "unexplained," C.S. makes no effort to articulate how the failures affected his ability to present his case. C.S. cites no authority for his assumption that the mere fact that an error or omission is "willful" or "unexplained" necessarily leads to the conclusion that it was prejudicial, without evidence that the delay was motivated by animus toward him or a desire to torment him. *Frye*, 440 S.W.3d at 415.

C.S.'s seventh example of prejudice is that he was forced to live outside of his home as part of the safety plan. C.S. disregards the fact that he agreed to the safety plan and was therefore arguably never "forced" to do anything. But more importantly, he again

24

misunderstands what qualifies as prejudice. Prejudice does not mean that an individual has suffered inconveniences in his personal life. Rather, prejudice for purposes of procedural due process means that the party's ability to try its case has been compromised in some manner, and that there is a reasonable probability that the outcome of the trial was affected. *See, e.g., State v. Forrest*, 183 S.W.3d 218, 224 (Mo. banc 2006) ("Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial."); *McNeal v. State*, 412 S.W.3d 886, 889 (Mo. banc 2013) ("'prejudice' means a reasonable probability that the outcome of the trial would have been different if [a different] instruction had been given."); *White v. State*, 314 S.W.3d 359, 362 (Mo. App. S.D. 2010) ("In general, '[p]rejudice means a reasonable probability of a different result . . . .'" (quoting *Hardy v. State*, 306 S.W.3d 159, 161 (Mo. App. S.D. 2010))).

As in *Frye*, C.S. "does not claim that [his] ability to defend against these allegations was compromised by the Division's delay, or that the Division made the wrong determination in [his] case as a result of this delay, or that the Division's delay was motivated by animus or a desire to torment" him. *Frye*, 440 S.W.3d at 415. Accordingly, his procedural due process claim fails.

**B. Substantive due process was not violated.**

C.S.—through his reliance on the alleged deprivation of the ability to live in the same house with his partner and children, including foster children who were staying in the house, during a portion of the investigation—appears to be asserting a violation of substantive due process. "The substantive due process component of the Fourteenth Amendment protects individual liberty against certain governmental actions regardless of the fairness of the procedures used to implement them." *Bromwell v. Nixon*, 361 S.W.3d 393, 400 (Mo. banc 2012) (internal quotations omitted). "To establish a violation of an individual's substantive due process rights, the plaintiff must demonstrate that the state's conduct was conscience-shocking and

25

violated 'one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Garozzo v. Mo. Dep't of Ins., Fin. Insts. & Prof'l Registration, Div. of Fin.*, 389 S.W.3d 660, 667 (Mo. banc 2013) (quoting *Bromwell*, 361 S.W.3d at 400). "'Such a claim includes two elements: (1) a protected property interest to which the Fourteenth Amendment's due process protection applies, and (2) that the governmental action was truly irrational.'" *Duffner v. City of St. Peters*, ED 102898, 2016 WL 145556, at *8 (Mo. App. E.D. Jan. 12, 2016) (quoting *Furlong Cos. v. City of Kansas City*, 189 S.W.3d 157, 170 (Mo. banc 2006)) (internal quotation omitted). Assuming that divesting the Division of its ability to investigate child abuse allegations is the appropriate remedy for a violation of due process, C.S. has not articulated either element of a substantive due process violation.

As to whether C.S. was deprived of "a deeply rooted fundamental right implicit in the concept of ordered liberty," *Garozzo*, 389 S.W.3d at 668, the only action C.S. complains of in his point is the Division's failure "to complete its investigation [within forty-five days] and provide notice of substantiated findings within" ninety days. But again, there is "no due process right to be free from the Division's investigation of the hotline report . . . and no due process right to have such an investigation start or stop at any particular time." *Frye*, 440 S.W.3d at 415. While C.S. refers, in his argument section, to living outside the family home for a period of time as "prejudice" that he has suffered, "Claims of error raised in the argument portion of a brief that are not raised in the point relied on are not preserved for our review." *Holliday Investments, Inc. v. Hawthorn Bank*, 476 S.W.3d 291, 297 n.5 (Mo. App. W.D. 2015).

Even assuming that C.S. has preserved a substantive due process claim by identifying a fundamental right of which he was deprived, in order to meet the second element, C.S. "'must

demonstrate that the government action complained of is truly irrational, that is something more than . . . arbitrary, capricious, or in violation of state law.'" *Creason*, 435 F.3d at 824 (quoting *Klein v. McGowan*, 198 F.3d 705, 710 (8th Cir. 1999)). Indeed, "[e]ven a bad faith violation of state law does not rise to the level of a substantive due process violation." *Frison v. City of Pagedale*, 897 S.W.2d 129, 132 (Mo. App. E.D. 1995).

The State has few, if any, interests more important than protecting children from abuse. *See In re Baby Girl ---*, 850 S.W.2d 64, 67 (Mo. banc 1993) ("Missouri has a significant interest in the welfare of all children born or residing in this state. One of the most important safeguards in protecting children's welfare is to have a mechanism in place to ensure their proper care and custody."); *Jamison*, 218 S.W.3d at 410 ("protecting children from abuse and neglect is a significant state interest"). And the safety plan, into which C.S. entered voluntarily, is directly related to this interest. Indeed, it would be the height of irresponsibility for the Division to investigate a parent for sexual abuse and not take steps to ensure the safety of foster children living with the alleged perpetrator. C.S. has not shown that the safety plan, including C.S. living outside of the family home, was so irrational as to violate substantive due process.

C.S.'s third point is denied.

### Conclusion

Because substantial evidence supports the trial court's finding that C.S. sexually abused K.S.W., and the Division's investigation did not violate C.S.'s procedural or substantive due process rights, the judgment is affirmed.

_____
Karen King Mitchell, Judge

Cynthia L. Martin, Presiding Judge,
and Mark D. Pfeiffer, Judge, concur.

27