**Robert and Donna BATEMAN, Appellants,**

v.

**Cathy RINEHART, Assessor, Respondent.**

No. SC 92486.

Supreme Court of Missouri, En Banc.

Feb. 26, 2013.

442

Jonathan Sternberg of Jonathan Sternberg, Attorney, PC in Kansas City, for the Batemans.

Patricia L. Hughes, Clay County counselor's office in Liberty, for the Assessor.

GEORGE W. DRAPER III, Judge.

Robert and Donna Bateman (hereinafter, "Taxpayers") appeal from the circuit court's judgment affirming the State Tax Commission's (hereinafter, "STC") classification of their property as commercial and assessing taxes accordingly. The STC's application of the factors set forth in section 137.016.5, RSMo 2000[1] to Taxpayers' property was supported by substantial and competent evidence in the record. The judgment is affirmed.[2]

### Factual and Procedural History

The facts are not disputed. The property at issue contains two parcels located within a residential subdivision in the City of Gladstone. The property is located at Northeast 68th Street and North Oak

---

1. All statutory references are to RSMo 2000 unless otherwise indicated.

2. This Court transferred this case after an opinion by the Missouri Court of Appeals authored by the Honorable Cynthia L. Martin.

Portions of the court of appeals opinion are incorporated without further attribution. This Court has jurisdiction pursuant to Mo. Const. art. V, sec. 10.

Trafficway and zoned residential. The two parcels are contiguous and approximately 1.22 total acres in size. One parcel was vacant, and the other parcel contained a residential structure. Commercial land uses are adjacent to the property on the north and west, while there are single-family land uses adjoining the property on the south and east.

In 2000, an applicant sought a zoning change from residential to commercial to develop the property for the installation and operation of three unattended gasoline pumps with an overhead canopy. The applicant requested a buffer zone variance. The planning commission unanimously rejected this application, citing many potential concerns with the twenty-four hour operation of an unmanned gas station directly adjoining residential property. Specifically, the planning commission found, "Without a primary building and staff management of the facility in terms of controlling noise and activity on the property, the use of the site becomes very intense." The city also found there were other vacant gas stations in town that would serve as more appropriate sites in light of the concerns about safety, noise, and disturbing residents at night.

In 2001, Taxpayers bought both parcels. Taxpayers demolished the residential structure because it was in a "bad condition" and could only be fixed "with a lot of expense." The parcels remained vacant and unused for many years.

In 2008, Taxpayers listed the property for sale with a realtor for $450,000. The realtor's listing described the property as "retail-pad." The property was characterized "as an assemblage for commercial development" although Taxpayers took no steps to have the property rezoned as commercial. The listing indicated the property was across the street from two car dealerships and had access to "lots of roof-tops all around—almost 12,000 people within 1 mile." The property was listed for more than a year, but no offers were made for its purchase. The listing expired in October 2009.

Effective January 1, 2009, Cathy Rinehart, the Clay County Assessor (hereinafter, "the Assessor"), reclassified the property from residential to agricultural and assessed the property at the agricultural rate of twelve percent of the fair market value, although she placed a fair market value on the property of $322,100 assuming a commercial use. Taxpayers appealed the assessment to the Clay County Board of Equalization which affirmed the Assessor's determinations. Taxpayers then filed a complaint for review with the STC.

An evidentiary hearing was held before a hearing officer in November 2009. Both parties agreed the property is vacant and unused; therefore, the factors set forth in section 137.016.5 provide guidance for how to classify the property for assessment purposes. The parties disputed what the property's classification should be after application of the factors.

Taxpayers presented evidence regarding the obstacles to commercial development of the property, including: the current residential zoning; the buffer and set-back requirements that would require variances before the property could be developed commercially; the need to negotiate access easements; the city's previous rejection of an application for rezoning in 2000; and the lack of offers to purchase the property when it was listed and marketed as commercial. In light of these obstacles, Taxpayers argued the property should have been classified residential, had a fair market value of $21,100, and should have been assessed accordingly. The hearing officer questioned Taxpayers about demolishing the residence on the property. The hear-

ing officer asked, "Is it fair to say that you figured that the best use for it would be commercial, so why go ahead and rehab ... the residential home?" Taxpayers replied, "I was—I knew that there was a possibility that someday it might be some type of use, whether that be, you know, an office or some type of commercial or something."

The Assessor argued the property should be classified and assessed as agricultural, but valued as commercial. The Assessor presented expert testimony from Clay County's commercial appraiser, who testified the property should be assigned a fair market value of $345,400 based upon sales of comparable commercial property. However, the appraiser believed the agricultural assessment rate should be applied to the fair market value to be consistent with the way other vacant and unused property was being treated in the county. The appraiser testified he received three inquiries about the value of the property, its classification, and other questions based upon the realtor's listing. Once the appraiser informed the potential buyers that the property was not zoned commercial, they "backed away" from purchasing it. The appraiser conceded the property could not be used for a commercial purpose during the current assessment cycle. The appraiser also testified he spoke with the city, reviewed the previous commercial proposal for the property that was rejected in 2000, and indicated the city would be amenable to a "less intense" commercial use.

The hearing officer applied the eight factors enumerated in section 137.016.5 and determined that most of the factors supported a finding of either residential or commercial use. Ultimately, the hearing officer found the appropriate classification for the property was commercial, and it should be assessed at the commercial rate

as opposed to the agricultural rate. The STC affirmed the hearing officer's decision, finding the marketing of the property for commercial development was an admission that the highest and best use of the property would be for commercial use, not residential development. Further, the STC found the current zoning of the property was neither conclusive nor persuasive on the point of its most suitable economic use. The STC reasoned that the fact that a proposed change in zoning in the past for a specific commercial use was rejected provided no basis to conclude that the property could not be used for some other commercial use in the future.

Taxpayers filed a petition for judicial review of the STC's decision. Taxpayers moved for summary judgment, arguing they were entitled to judgment as a matter of law regarding the property's classification. The circuit court overruled Taxpayer's motion for summary judgment and affirmed the STC's decision as being supported by competent and substantial evidence. The circuit court asserted whether commercial improvements are likely in the assessment cycle was not one of the factors set forth in section 137.016.5 for consideration. Taxpayers appeal.

## Standard of Review

■■■ On appeal, this Court examines the STC's decision, rather than the circuit court's judgment. *Shipman v. Dominion Hospitality*, 148 S.W.3d 821, 822 (Mo. banc 2004). This Court must determine whether the STC's decision: "(1) is in violation of constitutional provisions; (2) is in excess of the statutory authority or jurisdiction of the agency; (3) is unsupported by competent and substantial evidence upon the whole record; (4) is, for any other reason, unauthorized by law; (5) is made upon unlawful procedure or without a fair trial; (6) is arbitrary, capricious or unreasonable;

or (7) involves an abuse of discretion." *J.H. Berra Const. Co., Inc. v. Holman,* 152 S.W.3d 281, 282 (Mo. banc 2005); section 536.140. This Court is hesitant to substitute its judgment for the STC in matters of property tax assessment. *Savage v. State Tax Com'n,* 722 S.W.2d 72, 75 (Mo. banc 1986). This Court will defer to the STC's judgment regarding factual matters; however, the STC's decision interpreting statutory law is reviewed *de novo* and will be upheld only when its decision is authorized by law and supported by competent and substantial evidence upon the record. *State Bd. of Registration for Healing Arts v. McDonagh,* 123 S.W.3d 146, 152 (Mo. banc 2003). "In all cases, the taxpayer has the burden of proof when challenging the STC's assessment of property." *Algonquin Golf Club v. State Tax Com'n,* 220 S.W.3d 415, 420 (Mo.App. E.D.2007). Here, Taxpayers carry the burden of proving the proper classification of the property is residential rather than commercial.

## Analysis

In their sole point on appeal, Taxpayers argue the STC erred in holding that the "immediate most suitable economic use" of the property was commercial rather than residential. Taxpayers argue any commercial use of the property could not have been immediate, was speculative, was unsupported by sufficient competent and substantial evidence, and was unreasonable in that the property was zoned residential, solely used as residential, and all commercial uses were prohibited by the city's zoning ordinances. The Assessor disagrees, arguing the STC's decision should be upheld because there was competent and substantial evidence in the record to support the finding that the property's "immediate most suitable economic use" as defined under section 137.016.5 is commercial.

Article X, section 4(b) of the Missouri Constitution states real property shall be classified into subclasses as "residential," "agricultural and horticultural," or "utility, industrial, commercial railroad, and all other property" not included in residential or agricultural. This constitutional provision further provides these subclasses may be defined by law by the legislature. Section 137.016.1 defines these subclasses but recognizes not all real property may fit into these distinct categories. Specifically, the legislature acknowledged there may be instances when the property at issue is vacant, unused, held for future use, or a determination as to its classification cannot be made under the definitions set out in section 137.016.1. Hence, the legislature included section 137.016.5, which provides:

All real property which is vacant, unused, or held for future use; which is used for a private club, a not-for-profit or other nonexempt lodge, club, business, trade, service organization, or similar entity; or for which a determination as to its classification cannot be made under the definitions set out in subsection 1 of this section, shall be classified according to *its immediate most suitable economic use,* which use shall be determined after consideration of:

(1) Immediate prior use, if any, of such property;

(2) Location of such property;

(3) Zoning classification of such property; except that, such zoning classification shall not be considered conclusive if, upon consideration of all factors, it is determined that such zoning classification does not reflect the immediate most suitable economic use of the property;

(4) Other legal restrictions on the use of such property;

(5) Availability of water, electricity, gas, sewers, street lighting, and other public services for such property;

(6) Size of such property;

(7) Access of such property to public thoroughfares; and

(8) Any other factors relevant to a determination of the immediate most suitable economic use of such property.

(Emphasis added).

■■■ The primary rule of statutory interpretation is to effectuate legislative intent through reference to the plain and ordinary meaning of the statutory language. *State v. Graham*, 204 S.W.3d 655, 656 (Mo. banc 2006). This Court must presume every word, sentence or clause in a statute has effect, and the legislature did not insert superfluous language. *Wehrenberg, Inc. v. Dir. of Revenue*, 352 S.W.3d 366, 367 (Mo. banc 2011). "When the words are clear, there is nothing to construe beyond applying the plain meaning of the law." *State ex rel. Valentine v. Orr*, 366 S.W.3d 534, 540 (Mo. banc 2012) (quoting *State v. Rowe*, 63 S.W.3d 647, 649 (Mo. banc 2002)). A court "will look beyond the plain meaning of the statute only when the language is ambiguous or would lead to an absurd or illogical result." *Akins v. Dir. of Revenue*, 303 S.W.3d 563, 565 (Mo. banc 2010).

■■■ Both parties agree the property is vacant and unused, and therefore, section 137.016.5 provides the means of classifying the property into one of the three constitutionally authorized subclassifications if the property does not fit into one of the definitions set forth in section 137.016.1. Taxpayers concede application of most of the factors demonstrated the property could be classified for either residential or commercial use. If the evidence supports either of two opposing findings, a reviewing court is bound by the STC's determinations. *Algonquin*, 220 S.W.3d at 418. Despite this acknowledgment, Taxpayers focus on a few of the factors to make its argument for residential classification.

*(1) "Immediate Most Suitable Economic Use"*

Taxpayers claim the "immediate most suitable economic use" of vacant land must be the suitable economic use that can occur with the least delay. The parties agree the phrase "suitable economic use" means a use that is "suitable and able to produce the best value for the property." However, Taxpayers argue if the property is zoned for a specific economic use and other uses are prohibited by law, it must be presumed that the *"immediate* most suitable economic use" is that which does not require the law to be changed because the zoned use is the one that can occur with the least delay. To support this argument, Taxpayers rely on the holding in *Algonquin*.

In *Algonquin*, private golf courses and country clubs challenged the STC's classification of certain portions of their property as commercial property. The clubs were classified initially as entirely residential property, but the assessor reclassified the property in 2003 as part residential and part commercial. The land used as a golf course was classified as residential, while the amenities adjacent to the golf course were classified as commercial. At the evidentiary hearing, the parties entered into an extensive stipulation in which they agreed that many of the clubs were subject to: (1) present zoning schemes that prohibited commercial building and conversion to public golf courses; (2) duly recorded indentures that explicitly prohibited the property being used for any commercial purpose; and (3) specific municipal zoning ordinances that prohibited the issu-

ance of special use permits for conversion to a public golf course. The assessor failed to adduce any evidence other than to cross-examine witnesses. The Clubs appealed the STC's decision, arguing the STC misapplied the factors set forth in section 137.016.5, and the properties' "immediate most suitable economic use" was to convert the properties to residential homes. *Algonquin*, 220 S.W.3d at 416–18.

The assessor in *Algonquin* argued *Zimmerman v. Missouri Bluffs Golf Joint Venture*, 50 S.W.3d 907 (Mo.App. E.D. 2001) controlled how to construe section 137.016.5. In *Missouri Bluffs*, public and private golf clubs and country clubs in Saint Charles County appealed the STC's decision wherein the assessor classified the land at issue as residential, while the improvements and amenities on the land were classified as commercial. *Missouri Bluffs*, 50 S.W.3d at 909. Since these amenities were not encompassed within the definition of "land used as a golf course," and did not meet section 137.016.1's definition of residential property, the Eastern District reviewed the STC's application of the eight factors enumerated in section 137.016.5 to determine the amenities' "immediate most suitable economic use." *Id.* at 913. *Missouri Bluffs* concluded the STC considered the eight factors based on its statement in its decision, "[n]one of the factors individually nor all of the factors collectively, as applied to the structures and improvements on the subject property will support a residential classification." *Id.* at 914. Further, after examining the plain language of section 137.016.5, the court agreed with the STC that "the immediate most suitable economic use" of the country clubs' properties would be as public golf courses "because [the country clubs] have the equipment and facilities needed to convert from private golf clubs to public golf clubs...." *Id.*

The *Algonquin* court held that based upon the unique facts and circumstances at issue, *Missouri Bluffs* was distinguishable. The clubs in *Algonquin* presented "undisputed, detailed evidence outlining the zoning restrictions which permit the properties to be used only for residential purposes or as private golf courses," including the indentures that restricted other uses, the zoning restrictions on any commercial use, and testimony from municipal officials that public golf courses would not be welcomed or permitted. *Algonquin*, 220 S.W.3d at 420. In light of the assessor's failure to present any evidence to dispute these assertions or to demonstrate how any of the indentures or zoning restrictions could be overcome, the Eastern District determined the STC's finding that there were not sufficient obstacles to commercial use was not supported by competent and substantial evidence. *Id.* at 421.

*Algonquin* also construed the phrase, "immediate most suitable economic use." The assessor argued *Missouri Bluffs* controlled the analysis because of its emphasis on the word "immediate." Again, the *Algonquin* court disagreed, stating a reviewing court must look beyond the word "immediate" and consider the word "economic" as well in an attempt to give every word in the statute meaning. *Id.* After construing this phrase as a whole and applying the detailed, undisputed evidence presented by the clubs, the court held the record did not support a finding that the "immediate most suitable economic use" of the properties was as public golf courses in light of the significant zoning obstacles and indentures. *Id.*

Taxpayers' reliance on the holding in *Algonquin* is misplaced. First, Taxpayers' attempt to characterize the holdings in *Missouri Bluffs* and *Algonquin* as placing undue weight on the word "immediate"

would render meaningless the legislature's directive to examine all eight factors, along with construing every word in the phrase, "immediate most suitable economic use," by requiring an assessor to prove property could be used as classified within the current assessment cycle.[3] Second, the holding in *Algonquin* was based upon an intensive factual inquiry based upon the clubs' presentation of undisputed, detailed evidence outlining the zoning restrictions that would not be approved and indentures that ran with the land that further restricted the use of the property and prohibited commercial use. The assessor in *Algonquin* did not dispute or rebut this evidence with any explanation as to how these obstacles could be overcome.

Here, unlike the assessor in *Algonquin*, the Assessor presented evidence that the city was open to rezoning the property for a less intensive commercial use than the one that was rejected in 2000.[4] Rezoning the property at issue does not present nearly as many challenges as the property in *Algonquin*, which was a legal impossibility given the indentures, zoning restrictions, and testimony of municipal officials. Under this factual scenario, Taxpayers' failed to present persuasive evidence of the type of prohibitive economic or legal impediments to commercial use as in *Algonquin*.

### (2) Current Zoning Classification

Taxpayers place great emphasis on the current zoning of the property as dispositive to the classification of the property for assessment purposes. Taxpayers believe the current residential zoning makes any *immediate* commercial use a legal and practical impossibility. This Court disagrees. The current zoning classification of the property is only one of eight factors to be considered, and the legislature expressed its specific intent that "a zoning classification *shall not be considered conclusive*, if upon consideration of *all factors*, the zoning classification does not reflect the immediate most suitable economic use of the property." Section 137.016.5(3) (emphasis added). By including this language, the legislature envisioned vacant and unused property may be classified properly in a manner inconsistent with its current zoning.

Here, there was evidence in the record demonstrating the City would be amenable to a less intensive commercial use for the property. Moreover, Taxpayers' attempt to frame the holdings in *Missouri Bluffs* and *Algonquin* as creating a presumption or rule providing that current zoning controls the classification of property is contrary to the legislature's intent and not supported by a careful reading of those cases.

---

**3.** The dissenting opinion also places undue weight on the word "immediate" and focuses almost entirely on the property's current zoning classification to reverse the STC's decision. Section 137.016.5 contains no statutory requirement that the property must be utilized for a particular zoning purpose during that assessment cycle. Moreover, nothing in the plain language of subdivision (3) provides that when the present zoning prohibits a particular use, that zoning is the conclusive factor to be considered.

**4.** The dissenting opinion discounts the appraiser's testimony as speculative based solely upon his reading of the city council's minutes of the rejected 2000 commercial proposal. However, the appraiser testified, "After having talked with the City of Gladstone and reading the information [the Assessor] provided, taking into consideration C–3 zoning, they are trying to get the zoning down to either a C–0, C–1, or C–2, which is a less restrictive use on the property." Clearly, this testimony demonstrates the appraiser had recent and direct communication with the city about its amenability to a less intensive commercial use for the property that did not rest on mere speculation gleaned from the 2000 city council minutes.

### (3) Other Relevant Factors

Taxpayers also believe the STC placed undue weight on their marketing the property for commercial sale. Taxpayers argue the listing merely suggested the property at some point in the future, could be used as commercial property. Taxpayers assert this suggestion should have no impact on the property's "immediate most suitable economic use."

Section 137.016.5(8) permits the examination of any other factor relevant to the determination of the property's "immediate most suitable economic use." Taxpayers ceased using the property for residential purposes when they demolished the residence on the property, thus supporting a finding the property had no immediate prior use, whether it be residential or commercial. The record supports a finding that Taxpayers anticipated some form of commercial use for the property through its listing that was posted for more than a year and expired just a month before the evidentiary hearing. It is disingenuous for Taxpayers to discount the marketing of the property for commercial use and rely on the lack of offers to support its argument when they clearly anticipated the property could be put to commercial use with some semblance of ease based upon the listing and their testimony that they wanted the property to have a commercial use after demolishing the residence.[5]

### Conclusion

The STC's interpretation and application of section 137.016.5 to Taxpayers' property was supported by substantial and competent evidence in the record. The judgment is affirmed.[6]

RUSSELL, BRECKENRIDGE and FISCHER, JJ., concur.

TEITELMAN, C.J., dissents in separate opinion filed.

STITH, J., concurs in opinion of TEITELMAN, C.J.

WILSON, J., not participating.

RICHARD B. TEITELMAN, Chief Justice.

The principal opinion holds that the State Tax Commission (the Commission) determined correctly that the "immediate most suitable use" of Taxpayers' property is for commercial use even though the property is zoned for single family residential use and all commercial use is prohibited. The only way for Taxpayers to utilize the properties for commercial use is to convince the city to rezone the property with variances from setback and buffer requirements and to negotiate access easements across buffer strips owned by other private parties. I respectfully dissent because these contingencies are beyond the Taxpayers' control and preclude "immediate" commercial use.

---

**5.** The dissenting opinion repeatedly states the obstacles to rezoning the property consist contingencies beyond the Taxpayers' control and that no plan for commercial development was under consideration by the city. Taxpayers concede they never have attempted to rezone the property despite holding it out for sale as commercial property. As such, any assertion by Taxpayers regarding the ease or difficulty in rezoning must be characterized as speculative.

**6.** Taxpayers argue the appraiser's opinion regarding the property's value is erroneous because it is based upon commercial property comparables. Since Taxpayers claim the property should have been classified as residential, they request the appraisal value be disregarded on remand. This issue need not be reached in light of the Court's conclusion that the STC properly classified and assessed the property as commercial.

## I. Immediate most suitable economic use

Section 137.016.5 [1] provides that vacant properties can be classified for tax purposes according to the "immediate most suitable economic use." The immediate most suitable economic use is determined according to a list of eight factors that require consideration of the physical characteristics of the property as well as zoning and other legal restrictions on use of the property. The word "immediate" qualifies the phrase "most suitable economic use" and each of the statutory factors that determines the immediate most suitable economic use. Any tax classification pursuant to section 137.016.5 requires a finding that the taxing authority's proposed most suitable economic use is an "immediate" use. Analysis of a tax classification pursuant to section 137.016.5, therefore, requires a definition of the word "immediate."

The word "immediate" as used in section 137.016.5 is not defined by statute. When a word is not defined by statute, it is defined according to its plain and ordinary meaning as derived from the dictionary. *See State v. Oliver*, 293 S.W.3d 437, 446 (Mo.2009). The word "immediate" means "acting or being without the intervention of another object, cause, or agency" or "occurring, acting, or accomplished without loss of time." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1966). Similarly, the definition of "immediacy" is the "state of being immediate," with the word "immediate" defined as "freedom or absence of an intervening medium." *Id.* Consequently, an "immediate most suitable economic use" cannot be a use that absolutely is prohibited by existing zoning regulations.

## II. Section 137.016.5(3)

The principal opinion asserts that the zoning restrictions in this case are not conclusive because section 137.016.5(3) provides that the present "zoning classification shall not be considered conclusive, if, upon consideration of all factors, it is determined that such zoning classification does not reflect the immediate most suitable economic use of the property...." Section 137.016.5(3) does establish that, in some cases, vacant and unused property can be taxed in a manner inconsistent with its present zoning. However, the fact that, in some cases, property can be taxed as commercial when zoned residential does not mean that residential zoning never can be conclusive. To the contrary, the logic of section 137.016.5(3) demonstrates that present zoning restrictions can be conclusive.

The proposition that zoning is not conclusive if it does not reflect the immediate most suitable economic use is nothing more than a cautionary reminder, as it is simply a tautological restatement of what must be proven to reclassify the property in the first place; i.e., the immediate most suitable economic use. The necessary corollary to this is that zoning is conclusive when that zoning establishes and strictly defines the present, suitable economic use of the property.[2] When, as in this case,

---

1. All statutory references are to RSMo 2000 unless otherwise indicated.

2. Subdivision 3 of section 137.016.5 accounts for the fact that not all residential zoning or commercial zoning classifications absolutely prohibit all other uses. For instance, many municipalities employ different residential zoning classifications ranging from the strict, single family zoning at issue in this case to mixed-use residential classifications that permit substantial commercial activity within the residential area. In the latter case, as is common in many urban neighborhoods, residential zoning would be relevant but not conclusive because, unlike this case, some commercial use would be immediately legally permissible. The remaining statutory factors,

present zoning absolutely prohibits commercial use and there is no imminent change to the present zoning classification, then the commercial use cannot be an immediate use and the present, prohibitory zoning must be considered conclusive in the same manner as a present and absolute physical limitation on commercial use that cannot immediately be removed by the landowner.

### III. There is no substantial evidence that commercial use is an immediate use

The facts of this case demonstrate that Taxpayers cannot utilize their property immediately for commercial purposes. There is no dispute that both lots presently are zoned solely for single family residential use and all commercial use strictly is prohibited. Both lots are located at the end of a residential cul-de-sac in a residential subdivision. Any commercial use would require Taxpayers to negotiate access easements across private property. In short, there are multiple contingencies out of Taxpayers' control that stand in the way of any commercial use, let alone "immediate" commercial use. Given these facts, the assessor admits in her brief filed with this Court that any commercial use of the property is "improbable in the 13 months that remained in the assessment cycle." Commercial use cannot be considered "immediate" when the taxing authority admits that such use is "improbable" for more than a year.

The testimony from the city's expert witness, a commercial appraiser, does not alter this conclusion. He testified that the city would be "amenable" to some commercial use of the properties in the future.

The appraiser's testimony was speculative and cannot constitute substantial evidence to support the Commission's decision.

First, even if the city is "amenable" to some type of rezoning at some future time, any commercial use is still speculative and contingent and, therefore, by definition is not "immediate."

Second, even if one accepts the proposition that present zoning is not conclusive, the appraiser's testimony that the city was "amenable" to rezoning was largely speculative. The appraiser was not a member of the city council and was not in a position to offer a credible opinion as to how or when the city would rezone the property so as to permit commercial use. Much of the appraiser's knowledge of the city's supposed intentions were obtained from reading the city council's minutes from 2000, nearly a decade prior to the hearing in this case, when the prior property owner unsuccessfully tried to rezone the properties for commercial use. No "expert" is needed to read those same, dated minutes and speculate as to what the city may or may not do in the future. Further, while some council members thought the rezoning application simply presented "too intense" of a commercial use, others objected to any commercial use of the properties at all because it would place commercial use "right in the back yards" of neighboring residences. The appraiser also testified that the city was trying to rezone the property a less restrictive C–0, C–1 or C–2. This testimony I still fundamentally speculative as it simply states that the city is undertaking some sort of effort to rezone the property to perhaps allow some unknown level of commercial use at some unidentified time in the future. This testi-

---

such as location of the property and adjacent uses, then would be applied to determine if the commercial use is the immediate most suitable use. However, as in this case, when

the present zoning absolutely prohibits a particular use, subdivision 3 provides that zoning is conclusive.

mony is also fundamentally speculative. The appraiser's speculative testimony does not constitute substantial evidence to support the Commission's decision. *See, e.g., Tuf Flight Industries v. Harris,* 129 S.W.3d 486, 491 (Mo.App.2004)(testimony that a company's use of an alley constituted "roughly," "maybe," "probably," and "probably maybe" one-fifth of all use of the alley was not substantial and competent evidence to support the allocation of 20 percent of the alley's maintenance costs to the company).

In contrast to the appraiser's speculative testimony, his non-speculative testimony favors Taxpayers' position that commercial use is not an immediate use for their property. The appraiser testified that due to the current zoning restrictions, the properties would not be used as commercial during the assessment period that Taxpayers are challenging. He also testified that rezoning the property for commercial use would require passage of a commercial development plan by the city of Gladstone and that no such plan was under consideration. The non-speculative aspects of the appraiser's testimony demonstrate that the commercial use is not an immediate use for Taxpayers' property.

The principal opinion finds further support for the Commission's decision by referencing section 137.016.5(8), which permits the consideration of other relevant factors. One of the identified factors is the fact that Taxpayers listed the property for sale as commercial property. A landowner's subjective desire to maximize their profit has little to do with the objective factors pertaining to the physical characteristics and legal restrictions that are listed in section 137.016.5. The more relevant fact is that, over the course of nearly four years immediately preceding the hearing in this case, Taxpayers' marketing efforts were completely unsuccessful. The failure to sell the property for commercial use does not support a finding that the immediate most suitable use is commercial. To the contrary, when considered in conjunction with the single family residential zoning restriction and the appraiser's testimony, the fact that Taxpayers could not sell the property for commercial use makes it even clearer that there is no substantial evidence to support the Commission's decision that commercial use is the immediate most suitable economic use for Taxpayers' property.

### IV. *Algonquin*

Finally, the principal opinion asserts that the Commission's decision is supported by *Algonquin Golf Club v. State Tax Commission,* 220 S.W.3d 415 (Mo. App.2007). In *Algonquin,* the court of appeals found that the specific zoning obstacles and indentures made it impossible for private golf courses to be used immediately commercially as public golf courses. *Id.* at 421–22. Accordingly, the court reversed the Commission's decision allowing the private clubs to be taxed as commercial public courses.

Although there are no restrictive indentures at play in this case, the fact remains that, as in *Algonquin,* the present zoning restrictions in this case make it absolutely illegal for Taxpayers to utilize their property for commercial purposes. Like the private golf club in *Algonquin,* the individual taxpayers in this case presently cannot use their property commercially, and any such use is contingent on obtaining a change in the law. While *Algonquin* is factually distinguishable from this case, primarily due to the restrictive indentures not present in this case, these factual distinctions do not materially alter the analysis, for in both cases, the property owner legally is prohibited from using the property in the manner asserted by the taxing

authority. In both *Algonquin* and in this case, the legal restrictions precluded a finding that commercial use was the immediate most suitable economic use. The only material, practical difference between individual taxpayers in this case and the private golf clubs in *Algonquin* is that the individual taxpayers here are required to pay exponentially higher taxes for a use they cannot pursue, while the private golf clubs in *Algonquin* rightly were shielded from that result. This case is sufficiently similar to *Algonquin* to warrant the same result.

### V.  Conclusion

The Commission's decision rests on the assumption that someday Taxpayers' property might be rezoned to permit commercial use. Right now, the only possible use of the properties is as residential lots. Any commercial use is purely speculative. The Taxpayers' obligation to pay a commercial tax rate must wait until such time as there is a certain possibility that they actually can utilize their property for commercial purpose. Otherwise, Taxpayers are being required, in effect, to subsidize the county and other taxpayers on the objectively incorrect assumption that Taxpayers can use their property for commercial purposes. I would reverse the Commission's decision.