

# In the Missouri Court of Appeals
# Eastern District

<u>DIVISION FIVE</u>

| | | |
|---|---|---|
| IN THE INTEREST OF: L.Q.F., A.E.D., D.G.F., J.S.F., L.T.K., AND J.L.K. | ) ) ) ) | No. ED109823 |
| | ) ) ) ) | Appeal from the Circuit Court of Franklin County Cause No. 19AB-JU00217 |
| | ) ) ) | Honorable Ada Brehe-Krueger |
| | ) ) | Filed: March 15, 2022 |

### Introduction

Following a dispositional hearing on a petition for termination of parental rights ("TPR") in the Circuit Court of Franklin County, the circuit court entered judgment terminating the parental rights of D.D. ("Mother"). Mother appeals the judgment, arguing the circuit court erred in (1) denying her motion for extraordinary expenses to engage an expert to evaluate and testify to her physiological capabilities; and (2) allowing hearsay statements of two of Mother's children at the dispositional hearing. We affirm the judgment of the circuit court.

### Facts and Procedural Background

<u>Pre-Hearing Procedure</u>

On February 16, 2018, Mother's six children were taken into emergency protective custody by the Missouri Department of Social Services, Children's Division. They were taken into custody due to reports that Mother and J.F. ("Father"), her live-in paramour and the biological father of some of the children, abused and neglected the children.[1] At the time, all six children were juveniles.

On February 11, 2019, Father pleaded guilty to two counts of felony abuse or neglect of two of the children, L.T.K. and J.S.F. Father was sentenced to seven years in prison. Mother also was charged with felony abuse or neglect of L.T.K. and J.S.F. Those charges remained pending at the time of the TPR judgment at issue here.

On September 25, 2019, a juvenile officer of the Circuit Court of Franklin County filed a petition to terminate Mother's parental rights as to all six children. The first dispositional hearing was held on January 21, 2020. Shortly thereafter, the circuit court entered judgment terminating Mother's parental rights. Later, the circuit court set aside the judgment and appointed counsel to represent Mother, because Mother was indigent and had been unrepresented at the first dispositional hearing.

On October 13, 2020, Mother's appointed counsel filed a "Motion to Approve Cost of Extraordinary Expenses" asking the circuit court to approve up to $3,000 for an expert physical therapist to evaluate and testify to Mother's physiological history and limitations. The circuit court held a hearing and denied the motion on October 20, 2020.

A second dispositional hearing was held on March 15, 2021, approximately 18 months after the TPR petition was filed. At the hearing, Mother's counsel renewed the motion to approve

---

[1] Father's parental rights also have been terminated and are not a subject of this appeal.

the cost of extraordinary expenses. The circuit court again denied the motion and proceeded with the dispositional hearing.

The evidence adduced at the hearing and relevant to this appeal, viewed in the light most favorable to the judgment, *see In re T.T.G.*, 530 S.W.3d 489, 491 (Mo. banc 2017), is as follows.

<u>Evidence of Abuse Under Section 211.447.5(2)[2]</u>

Mother's two oldest children, L.T.K. and J.L.K., both were 18 years old by the time of the dispositional hearing on March 15, 2021. Neither L.T.K. nor J.L.K. testified at the hearing. Instead, Erin Duncan, a children's service worker, testified to statements that L.T.K. and J.L.K. previously made to her. Mother's counsel objected to hearsay. Counsel for the juvenile officer responded that the testimony was admissible pursuant to the hearsay exception for statements by juveniles established in *In re Marriage of P.K.A.*, 725 S.W.2d 78, 81 (Mo. App. S.D. 1987), and that L.T.K. and J.L.K. were juveniles when they made the statements. Mother's counsel replied that L.T.K. and J.L.K. were adults at the time of hearing. The circuit court overruled Mother's objection and allowed the testimony.

Over objection, Duncan testified that L.T.K. told her he had no desire to return home and he wished his siblings not to return home. She also testified that J.L.K. reported to her that Father, with Mother watching, choked and pulled the hair of one of the children. J.L.K. also told Duncan that her head was hit against the refrigerator and that she observed Mother and Father hit her siblings, A.E.D., J.S.F., and L.T.K. Without objection, Duncan also testified that two of the younger children, A.E.D. and J.S.F., stated they did not want to return home.

In addition to their statements to Duncan, L.T.K. and J.L.K. were interviewed at the Child Advocacy Center ("CAC") in February 2018. At the time of the interviews, L.T.K. was 14 years

---

[2] All Section references are to the Revised Statutes of Missouri (2016), as supplemented, unless otherwise indicated.

old and J.L.K. was 15. Video recordings and summaries of the CAC interviews were admitted into evidence at the hearing without objection. Mother's counsel stipulated to their entry into the record and asked the circuit court to evaluate the videos with "the totality of the circumstances and the evidence."

In his interview, L.T.K. stated that his parents get "really angry" and "abusive." His sister recorded the abuse and sent the recording to the police. "Lots of things" happened, which caused him to feel unsafe in his home. Father punched L.T.K. and his brother, J.S.F., while screaming and yelling. The punches left marks and bruises on L.T.K.'s body. The first time this happened was when L.T.K. was nine years old, and the last time was a couple of days before the police removed the children. Mother also hit L.T.K. and his siblings, leaving welts and red marks. Mother would bounce their heads off things and smack them. Mother grabbed J.L.K. by the hair and bounced her head off things. Mother hit the children with "miniature horse whips," belts, and her hands. She also threw things at the children. One time, Mother threw a hammer at L.T.K. and missed. She picked up the hammer and hit L.T.K. in the lower back with it. On one occasion, Father hit L.T.K. in the face with his hand, grabbed him by the neck, and drug him into another room. Father hit him again, grabbed him by his hair, and slammed his head against the wall three times. L.T.K.'s mouth bled from Father punching him. His brother, J.S.F., probably "got it the worst." Mother and Father hit J.S.F. with their hands, belts, and hangers. J.S.F. bled from the nose from Father hitting him.

J.L.K. stated in her CAC interview that she endured verbal abuse and "death threats" at home. Father mainly hit the boys, but when J.L.K. was approximately ten years old, she got "popped" in the face. Her head was hit on the refrigerator once or twice. She described several whips, a piece of wood trim, and switches used to hit the children. Mother would throw whatever was around her. On one occasion, J.L.K. tried to call the police, but Mother hung up the phone.

4

When J.L.K. was younger, Mother would hit her in the mouth and would hit the other children with an open hand. Father hit J.S.F. with a closed hand, and pulled L.T.K. by his hair and smacked him across the face. Father hit J.S.F. hard enough for his head to hit the ground and bounce back. Father hit J.S.F. a lot, and Mother once got angry at Father for kicking J.S.F. in the chest. J.S.F. had bruises and welts from Father hitting him on the legs, ribs, arms, and chest. The two youngest siblings, L.Q.F. and A.E.D., five and seven years old at the time of the interview, had their heads hit up against the wall. J.L.K. video recorded Mother yelling at her and L.T.K. and making a "fight or die" comment. J.L.K. was scared of Mother and Father, and of returning home with them.

J.L.K. also sat for a deposition on June 30, 2020. A transcript of the deposition was admitted into evidence at the dispositional hearing without objection. In the deposition, J.L.K. testified that Mother could be very violent and abusive. Mother got angry and, when she did not want to enforce punishment herself, she would have Father do it. Father "had the tendency to do whatever [Mother] said, but he also had a hair trigger for violence, especially towards people who were younger or smaller or less capable of protecting themself [sic]." Occasionally, Father threw things, but Mother was usually the one to throw things. Mother threw a hammer, dishes, shoes, and a lamp at the children. Mother and Father hit the children with whips, vacuum cords, switches, belts, and wood trim with staples in it. There were many such incidents that became everyday life.

J.L.K. elaborated that Father slapped and hit J.L.K.'s youngest sister, L.Q.F., all over her body and pulled her hair, but Mother was even meaner to L.Q.F. Mother once slapped L.Q.F. all over when she was four or five years old. At times, Mother hit L.Q.F. with a closed fist.

Father smacked J.L.K.'s youngest brother, A.E.D., pulled his hair and drug him by his hair. Father hit A.E.D. with a closed hand several times when A.E.D. was about four years old. Father hit D.G.F. in the stomach with a closed fist when she was about eight years old. Mother

5

backhanded J.S.F. and may have busted his lip. At least once a week, Mother told Father to hit J.S.F. Father hit J.S.F. with a closed fist and stomped on him, and Mother sat and watched. Father hit J.S.F. at least once a day for years.

Mother hit the oldest children, J.L.K and L.T.K., with a vacuum cord. She hit L.T.K. with a closed fist in the chest. Mother threw a hammer at L.T.K. and hit him in the lower back. When L.T.K. was eleven or twelve years old, Father hit him in the chest with a closed fist and L.T.K. could not breathe. Mother cracked J.L.K.'s head on the refrigerator and faucets and left a scar. J.L.K. used to have a stutter and got hit for that. Mother once ripped one of J.L.K.'s earrings out of her ear. J.L.K. recorded Mother threatening to kill the children with a knife and saying "fight or die." When Mother and Father hit J.L.K. and her siblings, they left marks on their faces, arms, legs, backs, stomachs, and chests. Mother did a lot of things to the children and allowed a lot of things to happen to them, and J.L.K. wanted to see her go to prison. The physical abuse by Father, of which Mother was aware, went back as far as J.L.K. could recall.

On June 30, 2020, J.S.F., then 14 years old, provided testimony via deposition. A transcript of J.S.F.'s deposition was admitted into evidence at the hearing without objection. Mother once slapped J.L.K. on her face and threatened to cut L.T.K.'s fingers off. She cut J.S.F.'s knuckle with a knife. Mother threw a hammer at L.T.K., hitting him in the head. She would sometimes kick J.S.F., and once pushed L.T.K. and J.L.K. to the ground.

Father hit J.S.F. on his buttocks, chest, and back, and would punch him in the face. Father "whooped" him with "belts, whips, all kinds of stuff, extension cords, whatever he could find." When J.S.F. was five or six, Father punched him in the face and caused J.S.F. to have crooked teeth. Another time, Father hit him in the jaw, causing him to pass out for two minutes. On yet

6

another occasion, Father hit J.S.F. with wood trim 15 to 20 times and caused him to bleed all over his arms, sides, and back.

One time, J.S.F. and L.T.K. were wrestling when Mother became angry and told Father to "whoop their butts, whoop their butts." When Father did not do anything, Mother threatened to kick him out of the house. Mother then handed Father a belt, which he used to hit J.S.F. and L.T.K. around their ribs, backs, and buttocks. Mother watched without doing anything. Mother would not intervene to stop Father's abuse unless J.S.F. fell to the ground. J.S.F. and his siblings adapted to getting beat every day. Mother left hand print marks on their bottoms, while Father would leave welts on their backs from "the whip and other items."

D.G.F., then ten years old, gave a CAC interview on February 21, 2018. Mother's counsel stipulated to entry of the video recording of the interview into the record. D.G.F. stated that Mother would use belts and hit the children all over. Father hit D.G.F. all over, hurting her and leaving red marks on her back. Father also hit J.S.F. on the head, leaving marks on him. Father slapped J.L.K., leaving a handprint on her. D.G.F. did not like Father because he was "mean" and "aggressive."

Mother was interviewed by the Franklin County Sheriff's Office on March 1, 2018. The video recording of the interview was offered into evidence by Mother's counsel and admitted without objection. The video recording was played at the dispositional hearing, and Mother corroborated much of it during her hearing testimony.

Mother admitted that she "did hit the children" but mostly yelled at them. Father would "whup" the children and hit them with his hands, a belt, and switches. In January 2018, Father kicked or punched J.S.F., and J.S.F. fell to the ground. Father continuously kicked and hit him in the back of the head, before "whacking" him in the face. Father did not stop until Mother knocked him down with a steel-toe boot.

7

A few days before the children were removed, Father drug L.T.K. by his hair or shirt. Father repeatedly pulled L.T.K.'s hair back and hit his head into the door and wall. Father choked L.T.K. after L.T.K. and J.L.K. were fighting. Mother saw Father's hands around L.T.K.'s neck as L.T.K. was purple and slobbering. Mother hit Father to stop him.

Mother acknowledged that she threw a hammer at L.T.K., but denied striking him with it. Counsel for the juvenile officer impeached Mother with her interview statement that she retrieved the hammer after throwing it and struck L.T.K. in his right kidney area. Mother admitted Father's abuse spanned several years and involved multiple incidents while the children lived with her and Father. Finally, Mother suggested she took immediate action in response to Father's abuse of the children, yet she claimed she could not run and getting somewhere quickly would take her "a minute" or "[q]uite a while."

During these incidents, all six children lived with Mother and Father. Mother and Father were together for approximately 14 years and remained together at the time of the children's removal.

Evidence of Persisting Conditions Under Section 211.447.5(3)

In addition to the above evidence that the children were abused by Mother and Father, additional evidenced adduced by both parties tended to show that Mother failed to engage in services to address the issues inhibiting the children's return home, and that their return potentially would be harmful.

Mother's interview and psychological evaluation revealed that Mother had not addressed her mental health needs and continued to blame the children for removal, suggesting the conditions that led to the children's removal were unlikely to be remedied soon. The children remained in

foster care and without a permanent home. Numerous services intended to give Mother the opportunity to prepare for reunification failed.

Although Mother complied with parts of her written service agreement with the Children's Division, she failed to address the abuse and domestic violence in her home. For example, Mother admitted during her hearing testimony that she did not engage in domestic abuse services, weekly individual psychotherapy, or a batterer's intervention program as required. Mother failed to complete a psychological evaluation until February 2020, two years after removal.

In the psychological evaluation, Mother denied ever striking or beating the children and expressed that Father's convictions were unfair because "the children were never bruised." The evaluator observed that Mother's history and demeanor indicated a "willingness to tolerate mistreatment and abuse from others." The evaluator also noted that, although Mother was directed to engage in services two years earlier, she had not yet done so. The evaluator recommended additional services to address domestic violence, none of which Mother had completed by the time of the hearing. Finally, the evaluator noted that Mother's medical history included a long-term, degenerative hip condition, which caused her significant pain and to walk with a limp.

Post-Hearing Procedure

The circuit court made extensive findings of fact and conclusions of law and entered judgment terminating Mother's parental rights on March 18, 2021. For its first statutory ground for TPR, under Section 211.447.5(2), the circuit court concluded that the children had been abused and neglected. For its second ground, under Section 211.447.5(3), the circuit court concluded that the children were under the jurisdiction of the court for at least one year, and the conditions that led to the assumption of jurisdiction persisted at the time judgment was entered. The circuit court

also concluded that termination of Mother's parental rights was in the best interests of the children under Sections 211.443 and 211.447.7.

On June 17, 2021, Mother's counsel filed a motion for new trial. One of Mother's arguments was that the circuit court erred in denying Mother's motion for extraordinary expenses because there was evidence at the dispositional hearing that Mother's physical limitations made her slow to react to abuse by Father. Mother also argued that the circuit court should have excluded as hearsay Erin Duncan's testimony to the statements made to her by L.T.K. and J.L.K. The circuit court held a hearing on July 20, 2021, and denied the motion. This appeal follows.

**Standard of Review**

TPR proceedings are reviewed under the same standard as other court-tried civil cases. *S.F.M.D. v. F.D.*, 477 S.W.3d 626, 632 (Mo. App. W.D. 2015). The judgment in a court-tried case is not reversible unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or misapplies the law. *In re R.R.S.*, 573 S.W.3d 717, 724-25 (Mo. banc 2019); *In re A.R.V.*, 561 S.W.3d 817, 822 (Mo. App. E.D. 2018). This Court must affirm the circuit court's judgment unless there is no substantial evidence to support it. *C.S. v. Dep't of Soc. Servs.*, 491 S.W.3d 636, 643 (Mo. App. W.D. 2016); *M.A. v. J.A.*, 781 S.W.2d 94, 95 (Mo. App. E.D. 1989).

We review a judgment terminating parental rights to determine whether "clear, cogent, and convincing evidence" supported one or more statutory ground for termination. *In re J.G.W.*, 613 S.W.3d 474, 479 (Mo. App. E.D. 2020). When the circuit court finds more than one statutory ground for termination, we need only find that one ground was proven and that termination was in the best interests of the children to affirm the judgment. *Id.* at 485.

10

We are mindful that TPR is "an exercise of awesome power" and "a drastic intrusion into the sacred parent-child relationship." *In re Adoption of H.D.D.*, 590 S.W.3d 360, 367 (Mo. App. S.D. banc 2019). Therefore, the decision to terminate parental rights will be reviewed closely. *In re C.M.H.*, 408 S.W.3d 805, 809 (Mo. App. S.D. 2013).

**Discussion**

Point I

Mother's first point on appeal is that the circuit court erred in denying her motion to approve extraordinary expenses for an evaluation and testimony by a physical therapist under Section 211.462 and 13 CSR 40-30.020. Mother argues that expert testimony to her physiological inability to immediately protect her children from abuse was critical to her defense.[3]

Pursuant to Section 211.462.2, if parents or guardians facing termination of parental rights are indigent and request counsel, then counsel shall be appointed by the court. The Department of Social Services regulation establishing fees for appointed counsel, 13 CSR 40-30.020(1), additionally states the "parents shall be provided representation in such cases which shall include counsel, investigative, expert and other services to ensure adequate representation." The regulation goes on to specify a fee schedule and "reasonable expenses" for which appointed counsel shall be reimbursed "at the conclusion of the representation." 13 CSR 40-30.020(2)(A), (B). Finally, the regulation provides, "The cost of extraordinary expenses must be approved in advance by the court but shall be reimbursed at the conclusion of the representation." 13 CSR 40-30.020(2)(C). "Extraordinary expenses" include psychiatric, psychological, and medical evaluations, expert witnesses, and depositions. *Id.*

---

[3] Mother does not specify whether her points on appeal challenging the evidence of abuse implicate both statutory grounds for TPR, each of which rests on abuse to a differing degree. To comprehensively address Mother's points, we assume they implicate both grounds for TPR.

11

Mother's appellate brief highlights the words "must" and "shall" in 13 CSR 40-30.020, suggesting the regulation is obligatory and the circuit court erred in denying the requested extraordinary expenses. Counsel for the juvenile officer responds that 13 CSR 40-30.020 contemplates the circuit court's approval of extraordinary expenses, meaning "these requests can be rejected by the Court."

The primary rule of statutory interpretation is to determine legislative intent by looking at the plain and ordinary meaning of the statutory language. *Moore v. Bi-State Dev. Agency*, 609 S.W.3d 693, 696 (Mo. banc 2020) (citing *Bateman v. Rinehart*, 391 S.W.3d 441, 446 (Mo. banc 2013)). We must "presume every word, sentence or clause in a statute has effect, and the legislature did not insert superfluous language." *Bateman*, 391 S.W.3d at 446.

Administrative regulations are interpreted using the same principles of statutory interpretation. *Stiers v. Dir. of Revenue*, 477 S.W.3d 611, 615 (Mo. banc 2016); *Doe v. St. Louis Cmty. Coll.*, 526 S.W.3d 329, 336 (Mo. App. E.D. 2017). When interpreting a statute or a regulation, we look to the plain and ordinary meaning of the words used. *Franks v. Hubbard*, 498 S.W.3d 862, 873 (Mo. App. E.D. 2016). We venture beyond the plain and ordinary meaning only when the language is ambiguous or where its plain meaning would lead to an illogical result. *Doe*, 526 S.W.3d at 336.

The regulation at issue here, 13 CSR 40-30.020(1), states that indigent parents facing TPR "shall be provided representation . . . which shall include counsel, investigative, expert and other services to ensure adequate representation." Plainly, the expert services that "shall be provided" are expert services "to ensure adequate representation." Thus, the question before the circuit court was whether the expert services requested by Mother were needed to ensure adequate representation. A contrary interpretation, isolating the term "shall" and ignoring the phrase "to

12

ensure adequate representation," would render that phrase superfluous and would fail to give effect to every clause in the regulation. It also would lead to the illogical result that 13 CSR 40-30.020(1) mandates the provision of boundless representation, including unlimited counsel, investigative, expert and other services.

Similarly, fees and reasonable expenses are to be reimbursed "at the conclusion of the representation" under 13 CSR 40-30.020(2)(A) and (B), while the cost of extraordinary expenses, such as expert witnesses, "must be approved in advance by the court but shall be reimbursed at the conclusion of the representation" under 13 CSR 40-30.020(2)(C). The contrasting language makes clear the distinction that, unlike reasonable expenses, extraordinary expenses must be approved in advance, and said approval must be by the court. The plain meaning is that extraordinary expenses are subject to approval. Again, an alternative interpretation isolating the terms "must" and "shall," and failing to contrast reasonable expenses and extraordinary expenses, would lead to the patently illogical result that the court lacks discretion to refuse any extraordinary expense whatsoever.

Perhaps because of their differing interpretations of 13 CSR 40-30.020, the parties do not identify a standard of review for Point I. *See* Rule 84.04(e);[4] *Bennett v. Taylor*, 615 S.W.3d 96, 99 (Mo. App. E.D. 2020). Consistent with our interpretation of the regulation, Mother's counsel acknowledged at oral argument, however, that 13 CSR 40-30.020 is not mandatory and allows a circuit court discretion. We review for an abuse of that discretion. *See, e.g.*, *In re G.G.B.*, 394 S.W.3d 457, 473 (Mo. App. E.D. 2013) (observing that trial court's determinations under Section 211.447.7 are discretionary, not mandatory, and therefore are reviewed for abuse of discretion).

Thus, Mother's argument becomes that the expert services she requested were needed to ensure adequate representation, and that the circuit court abused its discretion in opting not to

---

[4] All Rule references are to Missouri Supreme Court Rules (2021), unless otherwise indicated.

approve those extraordinary expenses. She argues the requested expert services, combined with other evidence at the hearing, would have demonstrated her inability to immediately protect her children from abuse by Father. Mother cites J.S.F.'s deposition testimony that Father hit J.S.F. and Mother did not intervene until J.S.F. fell to the ground. Mother also points to her own testimony at the dispositional hearing that she could not run and getting somewhere quickly would take her "a minute" or "[q]uite a while." Finally, Mother refers to her February 2020 psychological evaluation, which noted Mother's hip condition that caused her to limp.

Mother's requested physiological evaluation and proposed expert testimony miss the point. First, Mother's motion was filed on October 13, 2020, more than two and a half years after the children were taken into protective custody in February 2018. An evaluation by a physical therapist in October 2020 would have shed little light on Mother's physiological condition in February 2018 and the preceding years of abuse.

What is more, the evidence at the dispositional hearing proved in vivid detail that, during those preceding years, Mother not only failed to protect the children, she personally abused them. Mother hit the children, leaving welts and red marks. She hit the children with a closed fist, belts, whips, hangers, vacuum cords, and wood trim. Mother threw things, including a hammer, dishes, shoes, and a lamp, at the children. She bounced their heads off things and smacked them. She cracked J.L.K.'s head on the refrigerator and faucets and left a scar. Mother ripped an earring out of J.L.K.'s ear. She slapped J.L.K. and threatened to cut L.T.K.'s fingers off. J.L.K. recorded Mother threatening the children with a knife and telling them to "fight or die."

The evidence also proved that, short of abusing the children herself, Mother encouraged and even demanded Father's abuse of the children. When she did not want to impose punishment herself, Mother would have Father do it. At least once a week, she told Father to hit J.S.F. On one

14

occasion, Mother became angry and demanded that Father "whoop" J.S.F. and L.T.K. When Father initially did nothing, Mother threatened to kick him out of the house. She handed father a belt, which he used to hit the children in their ribs, backs, and buttocks as Mother watched.

From this evidence, the circuit court concluded, for its first statutory ground for TPR, that the children were abused pursuant Section 211.447.5(2). The court found that the abuse spanned several years and "Mother knew of the abuse and failed to protect the juveniles from the above referenced harm." For its second statutory ground pursuant to Section 211.447.5(3), the court determined that the conditions that led to its jurisdiction over the children persisted. Among other things, the court observed that "the children were subject to emotional/physical abuse by mother and [Father]." Ultimately, in concluding that TPR was in the best interests of the children pursuant to Sections 211.443 and 211.447.7, the court found "[d]eliberate acts of [Mother] that subjected the juveniles to a substantial risk of physical or mental harm," including "her physical abuse of her children."[5]

Thus, even assuming Mother's expert would have testified that Mother was physically unable to protect the children, substantial evidence supported the circuit court's judgment that Mother affirmatively abused the children. *See C.S.*, 491 S.W.3d at 643. The evidence of abuse supporting both statutory grounds for TPR was not only clear, cogent, and convincing, it was overwhelming. *See J.G.W.*, 613 S.W.3d at 479.

For these reasons, the expert services requested by Mother were not necessary to ensure Mother's adequate representation pursuant to 13 CSR 40-30.020(1), and the circuit court's denial

---

[5] The court also found that, to the extent Mother's evidence was inconsistent with that of the juvenile officer, Mother's evidence was unconvincing and not credible. We generally do not disturb such credibility findings because the circuit court is in a better position to judge the credibility and sincerity of witnesses. *Pearson v. Koster*, 367 S.W.3d 36, 44 (Mo. banc 2012).

of Mother's motion for approval of extraordinary expenses was not an abuse of its discretion pursuant to 13 CSR 40-30.020(2)(C).

Point II

Mother's second and final point is that the trial court abused its discretion in allowing testimony by children's service worker Erin Duncan to hearsay statements made to her by the two oldest children, L.T.K. and J.L.K.

A circuit court's determination regarding the admissibility of evidence is given substantial deference and "will not be disturbed absent an abuse of discretion." *In re T.D.S.*, 2021 WL 4955508 (Mo. App. E.D. 2021) at *2 (quoting *In re D.S.H. v. Greene Cty. Juv. Officer*, 562 S.W.3d 366, 369 (Mo. App. S.D. 2018)). We review the admission of evidence for prejudice, not mere error. *Id.* Evidentiary error in a court-tried case is not reversible so long as there is substantial admissible evidence in the record to support the judgment. *C.S.*, 491 S.W.3d at 646.

Taking first things first, hearsay is defined as "an out-of-court statement offered to prove the truth of the matter asserted." *T.D.S.*, 2021 WL 4955508 at *4. Unless it falls within a recognized exception, hearsay generally is not admissible. *Id.* This is so because "the out-of-court statement is not subject to cross-examination, is not offered under oath, and is not subject to the fact finder's ability to judge demeanor at the time the statement is made." *D.S.H.*, 562 S.W.3d at 369 (quoting *Bynote v. Nat'l Super Mkts., Inc.*, 891 S.W.2d 117, 120 (Mo. banc 1995)).

Counsel for the juvenile officer does not contest that the statements *sub judice* are hearsay, but maintains they were admissible pursuant to the *P.K.A.* exception to the hearsay rule. The *P.K.A.* exception allows the admission of hearsay statements of children regarding their abuse in certain circumstances. 725 S.W.2d at 81. The exception was created to avoid subjecting child witnesses to the emotional trauma of testifying in open court to their abuse, particularly when the abuser is

16

the child's parent. *Id.*; *C.S.*, 491 S.W.3d at 645. The exception applies in non-jury sexual, physical, or emotional abuse cases where (1) the primary concern is the best interests of the child; (2) abuse may have occurred or been threatened; (3) the child may not be competent or reasonably expected to testify to it; and (4) there is a substantial basis that the statements are true.[6] *In re A.A.T.N.*, 181 S.W.3d 161, 170 (Mo. App. E.D. 2005); *In re S.M.*, 750 S.W.2d 650, 654 (Mo. App. E.D. 1988).

Mother counters that the *P.K.A.* exception does not apply to the hearsay statements made by L.T.K. and J.L.K. to Duncan. When Mother's counsel objected to hearsay, counsel for the juvenile officer failed to make any record regarding the *P.K.A.* factors, particularly the competency of L.T.K. and J.L.K. to testify and any substantial basis that their statements were true. A record of the evidence establishing the *P.K.A.* factors, with their balancing of concerns for child witnesses and rights of the accused, is indispensable to the circuit court's admission of the evidence and to our review. The mere invocation of the *P.K.A.* exception will not suffice. Additionally, it is uncontroverted that L.T.K. and J.L.K. were children when they made their statements to Duncan. But they were 18 years old and no longer children when Duncan testified to those statements at the dispositional hearing. *See C.S.*, 491 S.W.3d at 645-46 (holding *P.K.A.* exception did not apply where declarant was child when statements were made but was 19 years old at time of hearing).

That said, we review the admission of this evidence for prejudice, not mere error. *D.S.H.*, 562 S.W.3d at 369. We cannot conceive of, nor does Mother identify, any prejudice from the challenged testimony. The testimony, though graphic, was minimal and fungible. Duncan testified over objection only to L.T.K.'s statement that he had no desire to return home and he wished his siblings not to return home; and J.L.K.'s statements that Mother watched Father choke and pull

---

[6] As relevant here, "child" is defined in Section 211.021(2) as a person under 18 years of age.

the hair of one of the children, J.L.K.'s head was hit against the refrigerator, and J.L.K. saw Mother and Father hit some of the other children. The testimony amounted to several sentences in a day-long hearing replete with other, admissible evidence of abuse.

Some of that other evidence proved the same facts asserted in the objectionable testimony. For instance, without objection, Duncan also testified that two of the younger children, A.E.D. and J.S.F., told her they did not want to return home. Likewise, in his CAC interview, L.T.K. reported he felt unsafe at home. In her CAC interview and deposition, J.L.K. testified she was scared of returning home to Mother and Father.[7] In her CAC interview, D.G.F., then only ten years old, expressed she did not like Father because he was mean.

L.T.K. recalled Father grabbing him by the hair, and Mother grabbing J.L.K. by the hair and bouncing her head off things. J.L.K. stated that Father pulled the hair of several of the children, and that J.L.K.'s head was hit against the refrigerator. Mother herself admitted that Father drug L.T.K. by his hair or shirt, pulled his hair, and choked him.

L.T.K. conveyed that Mother and Father hit the children, leaving welts, marks, and bruises. J.L.K. stated Mother and Father regularly hit the children. Father hit J.S.F. and stomped on him, while Mother watched. When Mother and Father hit the children, they left marks on them. In his deposition, J.S.F., then 14 years old, testified Mother and Father hit the children, and Mother handed Father a belt and watched as Father hit J.S.F. and L.T.K. In her CAC interview, D.G.F. recalled that Mother and Father hit the children, leaving marks on them. Mother acknowledged that she and Father hit the children, and that Father's abuse spanned years.

---

[7] Mother did not raise or preserve any hearsay objection to the CAC interviews of L.T.K. and J.L.K. or the deposition of J.L.K. Mother's counsel conceded as much at oral argument, and disclosed that he purposefully did not object to the deposition of J.L.K. for strategic reasons.

Even if we were to entirely set aside the discrete facts that were the subject of Duncan's hearsay testimony, substantial evidence of consistent and repeated abuse supported the circuit court's judgment. *See C.S.*, 491 S.W.3d at 646. Though only one statutory ground for TPR is needed for us to affirm the judgment, *J.G.W.*, 613 S.W.3d at 485, we already have concluded that the evidence of abuse supporting both statutory grounds was overwhelming. Mother does not otherwise challenge the statutory grounds or the circuit court's conclusion that TPR was in the best interests of the children. Accordingly, even assuming the hearsay testimony erroneously was admitted, we can find no resulting prejudice.

## Conclusion

For the foregoing reasons, the judgment of the circuit court is affirmed.

_____
Cristian M. Stevens, J.

Sherri B. Sullivan, C.J., and
Colleen Dolan, J., concur.

19